**BOEHRINGER INGELHEIM ANIMAL HEALTH, INC., Plaintiff,**

v.

**SCHERING–PLOUGH CORPORATION and Schering Corporation, Defendants.**

**No. 96–04047 (HAA).**

United States District Court, D. New Jersey.

April 27, 1998.

---

Jonathan A. Marshall, Jennifer Gordon, Scott D. Simpson, Pennie & Edmonds, New York City, H. Curtis Meanor, William Sandelands, Podvey, Sachs, Meanor, Catenacci, Hildner & Cocoziello, Newark, NJ, for Plaintiff.

Sidney David, Paul H. Konchanski, Lerner, David, Littenberg, Krumholz & Mentlik, Westfield, NJ, for Defendants.

### OPINION

HAROLD A. ACKERMAN, District Judge.

This matter comes before the court on motions for summary judgment filed by both parties in this patent litigation and upon plaintiff's renewed motion for a preliminary injunction. For the reasons detailed below, the motions are **DENIED.**

### I. Background

These motions follow the court's recent denial of plaintiff's motion for a preliminary injunction. *See Boehringer Ingelheim Animal Health v. Schering–Plough Corp.,* 984 F.Supp. 239 (D.N.J.1997). Both parties have come in conflict because of their interest in developing a vaccine for a disease known as Porcine Reproductive Respiratory Syndrome ("PRRS"). Boehringer alleges that Schering has infringed upon its patent. The patent in question, Patent No. 5,476,778 ("the '778 Patent"), covers a method which, Boehringer believes, is instrumental to the development of a PRRS vaccine. The '778 Patent makes five claims, two of which are at issue here:

1. A method of growing and isolating swine infertility and respiratory syndrome virus, ATCC–VR2332, which comprises inoculating the virus on a full or partial sheet of simian cells in the presence of serum in a suitable growth medium and incubating the inoculated cell sheet at about 34$C, to 37$C, until CPE is observed.

2. The method as recited in claim I wherein the simian cell line is MA–104.

*Id.* at 244.

Using the patented method, Boehringer developed two PRRS vaccines, RespPRRS® and RespPRRS/Repro®. In the instant case, plaintiff charges that Schering has infringed upon the patent in developing its own PRRS vaccine.

In June 1997, the court held a hearing on plaintiff's motion for a preliminary injunction. At the same time, it conducted a *Markman* hearing to conclusively interpret the claim language and its subsequent opinion defines each element of the '778 Patent. *See Id.* The court denied plaintiff's preliminary injunction motion because it held that Schering had raised a substantial defense on the issue of obviousness and therefore, Boehringer had failed to satisfy its burden of proving likelihood of success. *See Id.* at 258–259. In other words, Schering had raised a substantial question as to the validity of the patent under § 103(a). *See* 35 U.S.C. § 103(a) ("[P]atent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 ... if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains."). Based upon its resolution of the validity issue, the court did not need consider the likelihood of Boehringer's success regarding infringement, either literally

or under the doctrine of equivalents. *See Id.* at 262. Additionally, plaintiff did not establish irreparable harm. *See Id.* at 264. For those reasons, the court declined to issue a preliminary injunction. In the wake of that denial, Schering filed this summary judgment motion. Boehringer responded with its own summary judgment motion and a renewed motion for a preliminary injunction.

## II. Summary Judgment Standard

Federal Rule of Civil Procedure 56 provides that summary judgment may be granted only if the pleadings, supporting papers, affidavits, and admissions on file, when viewed with all inferences in favor of the nonmoving party, demonstrate that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). *See also Todaro v. Bowman,* 872 F.2d 43, 46 (3d Cir.1989); *Chipollini v. Spencer Gifts, Inc.,* 814 F.2d 893, 896 (3d Cir.), *cert. dismissed,* 483 U.S. 1052, 108 S.Ct. 26, 97 L.Ed.2d 815 (1987). In other words, "summary judgment may be granted if the movant shows that there exists no genuine issue of material fact that would permit a reasonable jury to find for the nonmoving party." *Miller v. Indiana Hospital,* 843 F.2d 139, 143 (3d Cir.), *cert. denied,* 488 U.S. 870, 109 S.Ct. 178, 102 L.Ed.2d 147 (1988).

The substantive law will identify which facts are "material." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Therefore, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* An issue is "genuine" if a reasonable jury could possibly hold in the nonmovant's favor with regard to that issue. *Id.*

The party seeking summary judgment always bears the initial burden of production, i.e., of making a *prima facie* showing that it is entitled to summary judgment. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). This may be done either by demonstrating there is no genuine issue of fact and that as a matter of law, the moving party must prevail or by demonstrating the nonmoving party has not produced evidence relating to an essential element of the issue for which it bears the burden. *Id.* at 322–23, 106 S.Ct. 2548. Once either showing is made, the burden shifts to the nonmoving party who must demonstrate facts supporting each element for which it bears the burden as well as establish the existence of genuine issues of material fact. *Id.* at 324, 106 S.Ct. 2548.

However, at the summary judgment stage, a court may not weigh the evidence or make credibility determinations—these tasks are left to the factfinder. *Petruzzi's IGA v. Darling–Delaware,* 998 F.2d 1224, 1230 (3d Cir.), *cert. denied,* 510 U.S. 994, 114 S.Ct. 554, 126 L.Ed.2d 455 (1993). Therefore, to raise a genuine issue of material fact, "'the [summary judgment] opponent need not match, item for item, each piece of evidence proffered by the movant,' but simply must exceed the 'mere scintilla' standard." *Id. See also Anderson,* 477 U.S. at 252, 106 S.Ct. 2505 ("The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant]."). "Although a 'scintilla of evidence' supporting the nonmovant's case is not sufficient to defeat a motion for summary judgment, it is clear that a district court should not weigh evidence and determine the truth of the matter itself, but instead should determine whether there is a genuine issue for trial." *Country Floors, Inc. v. Country Tiles,* 930 F.2d 1056, 1061–2 (3d Cir.1991).

If the court determines that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law, then summary judgment may be granted.

## III. Discussion

### A. Infringement

█ There are two steps in patent infringement analysis: "the first being the construction of the claim and the second being the determination as to whether the accused method infringes the asserted claim as properly construed." *Boehringer,* 984 F.Supp. at 245 (citing *Markman v. Westview,* 52 F.3d

967 (Fed.Cir.1995) (en banc), *affirmed,* 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996)). At the time of the preliminary injunction hearing, the court, in a *Markman* hearing, conclusively interpreted the claim language. *Id.* at 247–53. Thus, all that remains is a "determination as to whether the accused method infringes the asserted claim as properly construed." *Id.* at 245. Schering has brought this summary judgment motion arguing that as a matter of law, its vaccine production process does not incubate the inoculated cell sheet "until CPE is observed" as this court has construed that element. CPE means cytopathic effect which is "change in the microscopic appearance of a cell after infection with a virus" or the killing of inoculated cells. Boehringer alleges that it should be granted summary judgment because there are no genuine issues of material fact as to any of the patent's elements. Because there are genuine issues of material fact as to whether Schering has infringed upon the element "until CPE is observed," this court will only focus upon that element.

### 1. The Claim Language

The claimed method uses the term "until CPE is observed" as a "timing device" to instruct the reader on how to calculate when the incubation period is completed. *See Boehringer,* 984 F.Supp. at 252. CPE means cytopathic effect which is "change in the microscopic appearance of a cell after infection with a virus" or the killing of inoculated cells. The incubation occurs "until CPE is observed." In its *Markman* hearing, the court faced the question of whether the language dictated that the process terminate at the initial observation of CPE, at some degree of CPE, or at a time period to be determined independently of any degree of CPE. Ultimately, this court construed the patent language as focusing upon the occurrence of CPE where some significant degree of CPE, either "strong" or "good" will trigger the termination of the process rather than the initial observation or some independent factor. *See Id.* The process's preferred level of CPE is somewhat inexact and not amenable to further precision. The moment contemplated by the '778 Patent is subject to a more "qualitative determination." *See Id.*

### 2. Generally: Infringement

#### a. Literal Infringement

■ To succeed in its infringement claim, Boehringer must be able to prove that the Schering process infringed its patent, either literally or under the doctrine of equivalents. A defendant literally infringes where every limitation set forth in a patent claim is found in the accused process, exactly. *See Southwall Technologies, Inc. v. Cardinal IG Company,* 54 F.3d 1570, 1575 (Fed.Cir.), *cert. denied,* 516 U.S. 987, 116 S.Ct. 515, 133 L.Ed.2d 424 (1995). Infringement is a fact issue. *See Id.*

#### b. Doctrine of Equivalents

■ Even if the accused process does not literally infringe, infringement might exist under the doctrine of equivalents. *See Warner–Jenkinson Co. v. Hilton Davis Chemical Co.,* 520 U.S. 17, 117 S.Ct. 1040, 137 L.Ed.2d 146 (1997) (reaffirming the doctrine's vitality). Under this doctrine, "a product or process that does not literally infringe upon the express terms of a patent may nonetheless be found to infringe if there is 'equivalence' between the elements of the accused product or process and the claimed elements of the patented invention." *Id.* 117 S.Ct. at 1045 (citing *Graver Tank & Mfg. Co. v. Linde Air Products Co.,* 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097 (1950)). Guided by *Graver Tank, supra,* which was the Supreme Court's last consideration of the doctrine, the Court reiterated that an equivalency analysis is not a formulaic one, but rather, a contextual one which focuses on the patent, the prior art and the particular circumstances of the case. *See Id.* 117 S.Ct. at 1047 (citing *Graver Tank, supra,* at 609, 70 S.Ct. 854). As the Court explained:

> Consideration must be given to the purpose for which an ingredient is used in a patent, the qualities it has when combined with the other ingredients, and the function which it is intended to perform. An important factor is whether persons reasonably skilled in the art would have known of the interchangeability of an in-

gredient not continued in the patent with one that was.

*Id.*

Although the Supreme Court remains committed to the doctrine of equivalents, it has expressed concern that in the past, lower courts have employed such an overbroad interpretation that the doctrine "has taken on a life of its own, unbounded by patent claims." *Id.* 117 S.Ct. at 1048–49. Thus, in order to steer the doctrine back on course, the court explained that the doctrine "must be applied to individual elements of the claim, not to the invention as a whole" because it is each element which is "material to defining the scope of the patented invention." *Id.* at 1049. The Court adopted this approach because it feared that any other approach, e.g. looking at the invention as a whole, could effectively eliminate a material element in its entirety. *See Id.*

■ According to the Federal Circuit, infringement under the doctrine of equivalents is an issue of fact to be submitted to the jury. *Hilton Davis Chemical Co. v. Warner–Jenkinson Co., Inc.*, 62 F.3d 1512 (Fed.Cir.1995). The Supreme Court has not conclusively decided this issue, but there is "ample support" for that holding and "no other decision of the Supreme Court necessitates otherwise." *Warner–Jenkinson, supra*, at 1053. For our purposes, that means that this court will only grant a motion for summary judgment "where the evidence is such that no reasonable jury could determine two elements to be equivalent." *Id.* at 1053 n. 8.

#### i. The Linguistic Framework

Federal courts have employed different linguistic frameworks in evaluating "equivalence." The Supreme Court has expressed its reluctance with "micromanag[ing]" the Federal Circuit's word choice and has not indicated whether it prefers the "triple identity" test—"focusing on the function served by a particular claim element, the way that element serves that function, and the result thus obtained by that element"—or the "insubstantial differences" approach. *See Warner–Jenkinson, supra*, at 1054. Suffice it to say that this court is aware that the traditional "triple identity" test might not be "the

test" and in some instances, may not end the inquiry. *See Hilton–Davis, supra*, at 1518, 1521–22; *see also Sofamor Danek Group, Inc. v. DePuy–Motech, Inc.*, 74 F.3d 1216, 1222 (Fed.Cir.1996). The "equivalents" inquiry requires proof of insubstantial differences which be informed by other factors such as evidence of copying, designing around or evidence that persons reasonably skilled in the art would have known of the interchangeability elements. *See Hilton–Davis, supra*, at 1518, 1521–22; *see also Sofamor Danek Group, supra*, at 1222.

Ultimately, the "particular linguistic framework used is less important than whether the test is probative of the essential inquiry: Does the product or process contain elements identical or equivalent to each claimed element of the patented invention?" *Warner–Jenkinson, supra*, 117 S.Ct. at 1054. As the Supreme Court has noted:

> Different linguistic frameworks may be more suitable to different cases, depending on their particular facts. A focus on individual elements and a special vigilance against allowing the concept of equivalence to eliminate completely any such elements should reduce considerably the imprecision of whatever language is used. An analysis of the role played by each element in the context of the specific patent claim will thus inform the inquiry as to whether a substitute element matches the function, way, and result of the claimed element, or whether the substitute element plays a role substantially different from the claimed element.
>
> *Id.*

Eventually, the Supreme Court anticipates that the Federal Circuit will "refine the formulation of the test . . . in the orderly course of case-by-case determinations." *Id.* At this time, this court will follow the standards established in *Hilton–Davis* and *Sofamor*.

#### 3. The Instant Case

In the instant case, Schering has directed the court's attention to the element "until CPE is observed." That element dictates that the patented process terminate at the moment some significant degree of CPE, either "strong" or "good," is observed.

Whether significant CPE exists is a "qualitative determination." According to Schering, by focusing upon maximum yield or titer rather than CPE, its process does not infringe upon the '778 Patent, either literally or under the doctrine of equivalents. Whereas the patented method incubates until a significant degree of CPE is observed, the Schering process operates for a fixed time period of XX hours.[1] Nevertheless, Boehringer asserts that there is a direct correlation between the XX hour period and the development of significant degrees of CPE.

There is no dispute that the Schering process involves the incubation of the virus for XX hours, but the process also requires that the technician record CPE at the end of this period. There is some debate as to the purpose of that step. Citing testimony from Dr. Hesse, one of Schering's scientists, Boehringer describes this step as a quality control check used to "red flag" any problems in this system. *See* Plaintiff's Rule 56.1 Statement at ¶ 16. Schering concedes that it records CPE to make "sure the vaccine production process work[s] properly," but it denies that the process is "quality controlled by the observation of CPE." *See* Defendant's Rule 56.1 Response. In other words, Schering suggests, the process cannot work unless CPE occurs, but it does not measure CPE to gauge the output of the process. Thus, Schering acknowledges that the development of CPE may be a "defining moment" in the initial isolation of an unknown virus, but not in the commercial production of the vaccine. With commercial production, one knows that the process is capable of isolating the virus and for that reason, need not be concerned with CPE. Commercial production focuses on yield. In further support of its argument, Boehringer relies upon the opinion of Dr. Edward Dubovi, one of its experts. According to Dr. Dubovi, there is a direct correlation between the CPE and viral titer (i.e. the amount of virus). *See* Dubovi Decl. at ¶ 53. By using scientific studies which measure CPE, Schering discovered that the XX period would yield maximum titer. *See* Dubovi

Decl. at ¶ 59. Thus, based upon his review of Schering documents, Dr. Dubovi believes:

> Schering set their harvest criteria based on extent of CPE which is interchangeable with a defined time period [ (XX +/− XX hours) ] and viral titer under consistent growth conditions.

*Id.* at ¶ 53.

From the record, it cannot be denied that the creators of the process were very much aware of CPE levels. Schering's Outline of Production notes that:

> There appears to be a twelve hour optimal harvest window; it is recommended that the virus fluids be harvested at [XX +/− XX] hours post inoculation. CPE at that time is 1–3 [25–75%]; if the CPE goes beyond 3[75%], titers will be considerably lower.

*Id.* at ¶ 54.

At optimal growth, there is typically "PRRS CPE ... encompassing 50–75%" and the procedure is tested by "titration ... and observing for CPE." *Id.* at ¶ 53.

Schering does not dispute that the titration testing methodology is based upon the observation of CPE. *See* Defendant's Reply Br. at 30 n. 12. Even if the degree of CPE plays a role in its process, Schering asserts that the development of significant CPE did not control the choice of XX hours. The choice of XX hours, it believes, produces the highest possible output of the virus. But, at XX hours, CPE ranges from 25 to 75%. At a *minimum*, the Schering process focus upon the development of CPE, but that does not necessarily mean that the process terminates when it reaches "significant" CPE. The court will look at what constitutes "significant" CPE next.

Both sides agree that significant CPE occurs between 25 and 75% CPE. *See* DuBovi Decl. at ¶ 56. Furthermore, Boehringer has not disputed Schering's assertion that one may find CPE's ranging from 25 to 50% after two days. *See* Schering Reply Br. at 26. Some of Schering's XX hour "batches" have contained only 25% CPE. *See* Boehringer

---

1. The exact number of hours during which the Schering process operates has been filed under seal.

Rule 56.1 Statement at ¶ 54. There is no question that after XX hours, a "significant" degree of CPE exists, but the patented method demands more than just the existence of "significant" CPE. Boehringer's intimates that the court should ignore that this element of the patented method is comprised of the word "until," but it cannot do that.

Neither this court nor any party should be permitted to eliminate the word "until." *See Boehringer,* 984 F.Supp. at 253. That means that once some "significant level of CPE develops ... the incubation period stops...." *Id.* At the *Markman* hearing, Boehringer wanted to argue that the patent imposed a minimum time period—"long enough for CPE to be observed"—but no maximum, allowing the process to continue indefinitely. *See Id.* at 252. However, the court's construction of the patent language contemplates that "incubation will be halted after the observation of some degree of CPE and rejects any wholesale adoption of Boehringer's position." *Id.* at 253. There must be some stopping point, not necessarily when minimal CPE is observed, but when there is a significant degree of CPE. If Schering establishes that 25% CPE occurs after two days, the fact that Schering's process lasts XX hours would preclude literal infringement. But some Schering batches contain 25% CPE and thus, a fact issue exists as to when significant CPE (at least 25%) occurs. Nevertheless, for reasons which I will explain, there can be no literal infringement.

### a. Literal Infringement in the Instant Case

█ Notwithstanding the continuing persisting dispute over certain fact issues, there is no literal infringement. There is a correlation between and perhaps, a focus upon, CPE and Schering's timing device (XX hours), but the elements of the two processes are not identical. Batches taken from the Schering process range from 25 to 75% and thus, it cannot be argued that the process is focused exclusively on reaching some degree of CPE. The observation of CPE, while arguably important, plays a less central role in Schering's vaccine production process. Moreover, the patent contemplates a qualitative evaluation as opposed to Schering's quantitativeness and exactitude.

### b. Equivalency

█ Because the Schering process does not literally infringe, the court must consider whether the evidence is such that no reasonable jury could find "equivalence" between the element of the Schering process and the claimed elements of the patented method. Schering contends that, as a matter of law, there is no equivalence between the "until CPE is observed" element and its timing mechanism. In making its determination, the court will focus upon the function served by the element, the way that element serves that function, and the result thus obtained by it. If helpful, it should also evaluate other factors such as evidence of copying, designing around or evidence that persons reasonably skilled in the art would have known of the interchangeability elements. *See Hilton–Davis, supra,* at 1518, 1521–22; *see also Sofamor Danek Group, supra,* at 1222.

█ Here, there is no question that each element serves the function of indicating when to terminate the respective process. However, Schering believes, both the way of terminating the growing process and the result obtained is "totally different." *See* Defendant's Br. at 13. Generally, the "way" that the termination element of each process serves the function of indicating when to terminate the process in that it designates a particular moment to halt everything. The Schering process differs in that it chooses a fixed period of time rather than a CPE measurement, but Boehringer believes that Schering has merely used a "different unit of measurement in an attempt to confuse the issue." *See* Plaintiff's Reply Br. at 5. Even though Schering employs a unit of time rather than a degree of CPE, Boehringer contends that the two are the same. This point requires further explanation.

Undoubtedly, Schering should not be permitted to evade infringement simply by selecting a different unit of measurement. Imagine two processes for boiling water where the first process terminates at the moment that the water bubbles and the second one employs an exact period of time, e.g.

5 minutes, at which, under controlled, conditions, the water boils. Here, the two measurements are equivalent, if not identical. Unless the convergence of bubbling and five minutes is pure coincidence, the second process infringes. Similarly, if the choice of XX hours depends upon the moment that "significant" CPE is observed—which is also the moment that the patented process must be terminated—the two elements may be equivalent. Much of that depends upon what constitutes "significant" CPE. "Significant" CPE is inexact and does not necessarily correspond to an exact percentage, but both parties accept that 25% CPE corresponds to a moment when the level of CPE becomes significant. Notwithstanding other related issues, Boehringer's argument can only be successful to the extent that after XX hours of incubation, the degree of CPE hovers around 25%. Contrary to Boehringer's reasoning, the equivalence argument is substantially impaired if 25% CPE develops well before XX hours.

Whether the degree of CPE approaches 25% at XX hours remains a genuine issue of material fact. The record indicates that after XX hours of Schering's process, there is 25–75% CPE, but other facts undermine Boehringer's position. Typically, the XX hour period approaches 50–75% CPE. According to Schering, the onset of significant CPE, which is the moment that the patented process ends, occurs at 48 hours, a full XX hours before the end of the Schering process. *See* Schering Reply Br. at 26.

Boehringer wants to argue that as long as significant CPE (at least 25%) exists after XX hours, infringement exists. But that argument must fail because subsumed within it is the assumption that the word "until" cannot be read out of the patent. That means that incubation must be halted at the moment of "significant" CPE, not some unspecified time thereafter. *See Boehringer*, 984 F.Supp. at 253. Within the context of this motion, neither party has established definitively when 25% occurs. Thus, there is a genuine issue of material fact which precludes this court from granting summary judgment. Additionally, one might also argue that the convergence of 25% CPE and

the XX hours is nothing more than fortuitous.

Assuming that 25% CPE occurs at forty-eight hours, but 50% occurs at XX, the fact-finder must decide whether there is an insubstantial difference between stopping at 25% and 50% CPE. For instance, if Schering chose XX hours to ensure 25% CPE knowing that on some occasions that it would produce 50% CPE, but also believed the difference to be insubstantial, there may be equivalence. These are questions which should be left to the jury.

Finally, the comparison between the "results" of each process is equally inconclusive. The timing mechanism of both processes achieve the result of growing the PRRS virus. Arguably, the Schering timing mechanism produces the maximum output possible. Other than briefly referring to the argument in its original brief, Schering has not made much of this argument. Whether it is anything more than a distinction without a difference is an issue that should be left to the jury. In the instant case, summary judgment shall be **DENIED.**

### B. Obviousness

■ As in the preliminary injunction hearing, Schering has attacked the '778 Patent directly on the ground of obviousness. Under 35 U.S.C. § 103(a).

> [A] patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 ... if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. 35 U.S.C. § 103(a).

Therefore, if Boehringer's invention was not patentable under Section 103(a), its infringement action instantly melts away. However, substantial hurdles confront the party asserting a invalidity defense because there is a presumption of validity and the defendant bears the burden of proving obviousness by clear and convincing evidence. *Litton Systems v. Honeywell,* 87 F.3d 1559, 1566 (Fed.

Cir.1996), *judgment vacated on other ground,* ——— U.S. ———, 117 S.Ct. 1240, 137 L.Ed.2d 323 (1997).

▆▆▆ Obviousness under section 103 is a ultimately a question of law which involves four factual inquiries of:

(1) the level of ordinary skill in the pertinent art; and

(2) the scope and content of the prior art; and

(3) the differences between the claims and the prior art; and

(4) secondary considerations, if any, of nonobviousness.

*See B.F. Goodrich Company v. Aircraft Braking Systems Corp.,* 72 F.3d 1577, 1582 (Fed.Cir.1996).

Secondary considerations include "evidence of factors tending to show nonobviousness, such as commercial success of the invention, satisfying a long-felt need, failure of others to find a solution to the problem at hand, and copying of the invention by others." *Id.*

▆▆▆ This is not the first time that this court has confronted the validity issue in this case. In February 1998, the court denied Boehringer's request for a preliminary injunction by finding, among other things, that Boehringer had not satisfied its burden on the validity question. The instant motion involves different burdens of proof which are less favorable to Schering. In the preliminary injunction context, the patentee bears the burden of proving likelihood of success and thus, when the validity of the patent is challenged, the patentee must demonstrate that the alleged infringer's defense lacks "substantial merit." *See Boehringer,* 984 F.Supp. at 254. In stark contrast, this court may "properly grant, as a matter of law, a motion for summary judgment on patent invalidity when the factual inquiries into obviousness present no genuine issue of material facts." *Ryko Manufacturing Co. v. Nu–Star Inc.,* 950 F.2d 714, 716 (Fed.Cir.1991). It would be wrong to assume that Schering's success in defeating the preliminary injunction motion is tantamount to granting a summary judgment motion. Whereas Schering survived the preliminary injunction motion because Boehringer failed to expose Scher-ing's defense as completely inadequate, Schering must now demonstrate that there are no genuine issues of material fact which control the obviousness analysis. That is a far more difficult burden.

At the preliminary injunction hearing, Schering made two arguments to demonstrate invalidity. First, it asserted that the '778 Patent is unenforceable because "when viewed in the context of the prior art from the perspective of an ordinarily skilled virologist ... the growing and isolating of swine infertility and respiratory syndrome virus ATCC–VR2332 on simian cell lines was nothing more than the predictable result of an application of routine prior art procedures to the prior art." Second, it took the position that the patent was made obvious by the earlier isolation of another porcine respiratory virus, swine influenza, using simian cells. This court rejected the first, but it held that the second defense raised substantial questions about the validity of the '778 Patent. *See Boehringer,* 984 F.Supp. at 259.

Before conducting the analysis, it is important to note that the court issued its previous opinion on this issue based upon an "assessment of the persuasiveness of [Schering's] evidence ... without all evidence that may come out at trial." *Id.* Contrary to the position taken by the defendant, the court may now make its determination by considering evidence previously not examined. The court will also revisit those issues within the context of a summary judgment motion.

*1. Factual Inquiry*

*a. Level of Ordinary Skill in the Pertinent Art*

▆▆▆ In the instant case, the pertinent art is veterinary virology and the level of ordinary skill is a bachelor's degree in microbiology or biology with several years experience.

*b. Scope and Content of Prior Art*

The parties agree as to what constitutes prior art, but there are some notable issues of dispute. I have already concluded that:

It is commonly known by virologists that viruses may be grown by inoculating a sample of the virus onto either a full or

partial sheet of cells and then incubating the virus and looking for the presence of CPE. Virologists also know that the presence of a "suitable growth medium" and "serum" may be conventionally used to facilitate the growing. Moreover, there is nothing unusual about choosing an incubation temperature of 34 to 37 degrees. Choosing a cell line is perhaps the most challenging task faced by virologists.

Success is critically dependent on choosing the right cell line, but whether a particular virus will grow on a given cell and under what conditions remains uncertain and unknown. The "usefulness of any given cell line appears to depend on luck...."

The daunting aspects of this complex problem do not place the virologist in complete darkness because virologists anticipate that most cell lines will be ineffective. Moreover, they are aware that with an unknown virus, there is a need conduct several tests with many cell lines. This knowledge makes the number of potentially viable cell lines almost infinite. Success may be achieved by using either cell lines derived from a species that differs from source of the diseased homogenate or from the actual source species. *Boehringer,* 984 F.Supp. at 255.

Boehringer asserts that its patent was not obvious because the prior art does not contain any examples of PRRS being isolated on simian cells. It posits that prior art suggests that it would be routine to use a host cell from the same species as the infected animal, e.g. using porcine alveolar macrophages as a host cell for a porcine virus, and not from another species such as a monkey.

When this court denied Boehringer's preliminary injunction motion, it noted that while the prior art is not replete with examples of simian cells being used with porcine viruses, scientists had isolated a porcine respiratory virus, swine influenza, using a simian cell line prior to Boehringer's isolation of PRRS. *See Id.* at 255. At the preliminary injunction hearing, Boehringer accepted this fact, but for purposes of this motion, it disputes that claim. According to Boehringer, the swine influenza virus referred to during the hearing was actually a "swine influenza-

like virus" which had been isolated from humans on simian cells and not from monkeys. Thus, this "swine influenza-like virus" should not be considered a true porcine respiratory virus. *See* Plaintiff's Br. at 20.

To support its argument, Boehringer offers the following explanation:

> Different viruses have been called "swine influenza virus" in the prior art, and these viruses have caused some confusion in this case. One is the *true* "swine flu virus (SIV)—a porcine virus." The other virus is also commonly called "swine flu" virus because it has a certain property characteristic of true SIV, the "H1N1 antigenic phenotype." This human influenza virus is more accurately called "swine influenza-like" like virus. It has been isolated from human clinical specimens on simian cells. True swine influenza, or SIV, (from porcine sources) is not known in the prior art to have been isolated or grown on simian cells.

Plaintiff's Br. at 19; *see* Easterday Decl.

If one accepts Boehringer's differentiation between influenza viruses, one must conclude that the record does not establish that virologists have isolated the porcine version of swine flu (known as "SIV") on monkey cells. Arguably, those studying PRRS would be less likely to rely upon isolation techniques employed with "swine influenza-like" viruses taken from humans than upon techniques used to isolate SIV taken from pigs. This characterization of the pertinent virological principles may be proper, but Schering's attack is factual in nature. It maintains that scientists have, indeed, grown " 'true' swine influenza" on simian cells. *See* Defendant's Reply Br. at 7–10.

Schering cites three articles to undermine Boehringer's position. First, in an article published in a 1968 entitled "Influenza in Animals," the authors point out that:

> Isolation of virus is more frequently accomplished by the intramniotic inoculation of 9 to 10 year old embryonic eggs or inoculation of primary monolayers of monkey kidney....

*Id.* (quoting Rowland Decl. at Ex. C).

The quoted passage comes from a section entitled "Viral Isolation" and does not mention swine influenza by name, but the chapter does speak generally about equine influenza, avian influenza, and swine influenza. According to Schering, this establishes simian cells as a suitable host for swine influenza. Second, Schering cites an article from 1970 entitled "Evaluation of Three Cell Culture Systems as Substrates for Influenza Virus Assay" to "demonstrate[ ] the propagation of what Boehringer calls 'true' A-type swine influenza on monkey cells." *Id.* at 8. The article includes a table where it appears that the "A/Swine/1976/31" strain of influenza has been isolated on a primary rhesus monkey kidney. *See Id.* Boehringer has criticized this reference because the strain of the virus was actually passaged thirty-eight times in mice, forty times in embryonated chicken eggs, and then three times in rhesus monkey kidney before being used in the subject experiment. *See* Boehringer Reply Br. at Ex. B. ¶ 10 (Easterday Supplemental Decl.). Finally, the defendant references a paper entitled "The Behavior of Some Influenza Viruses in Tissue Cultures of Kidney Cells of Various Species" showing that "influenza viruses can be isolated and propagated in monolayer cultures of human kidney ... and in monkey kidney." *Id.* at 9. It does not state what kind of influenza has been isolated. The foregoing indicates that there is a genuine factual dispute as to what kind of kind of swine influenza has been isolated.

There is another arguably important aspect of swine influenza which will be discussed below. Swine influenza is a zoonotic disease which means that it affects more than one species, e.g. humans as well as pigs. On the other hand, PRRS is nonzoonotic which means that if a human comes in contact with a PRRS infected pig, the person will not be infected by the disease. Boehringer and Schering disagree as to the significance of this distinction.

*c. the differences between the claims and the prior art*

In the instant case, the court must consider whether, in light of the prior art at the time, one could have reasonably expected that the PRRS virus could be grown and isolated on simian cells. MA–104 in this case. *See Gillette, supra,* at 724 (obviousness does not require "absolute predictability of success," but only a "reasonable expectation of success"). As I have explained previously, basic virological principles teach at best that "one could attempt to isolate viruses from a mammalian tissue homogenate by inoculating a plurality of cell lines from different species." *See Boehringer,* 984 F.Supp. at 256. These basic principles did not make obvious the isolation of PRRS by trying a battery of cell lines which included simian cells such as MA–104. *See Boehringer,* 984 F.Supp. at 256. At most, this prior art would make Boehringer's patent "obvious to try," a finding which would not invalidate the patent. *See In Re Deuel,* 51 F.3d 1552, 1559 (Fed.Cir.1995). The difference between obviousness and "obvious to try" may be explained as follows:

> Prior art makes an invention "obvious to try" when a "general disclosure may pique the scientist's curiosity, such that further investigation might be done as a result of the disclosure, but the disclosure itself does not contain sufficient teaching ... or that the claimed result would be obtained if certain directions pursued." *Gillette Co. v. S.C. Johnson & Son,* 919 F.2d 720, 725 (Fed.Cir.1990). In the "obvious to try" situation, the "prior art gives either no indication of which parameters are critical or no direction as to which of many possible choices is likely to be successful." *Merck & Co., Inc. v. Biocraft Laboratories, Inc.,* 874 F.2d 804, 807 (Fed.Cir.1989). "Teachings of references [may] be combined" to establish obviousness, but there must be some teaching, suggestion or incentive supporting the combination. *In Re Fine,* 837 F.2d 1071, 1074 (Fed.Cir.1988); *In Re Geiger,* 815 F.2d 686, 688 (Fed.Cir. 1987). Finally, obviousness analysis of a claimed combination must include consideration of the results achieved by that combination. *Gillette, supra,* at 724.

*Boehringer,* 984 F.Supp. at 256.

Without more guidance from sources other than the conventional methodology, one could not have reasonably expected success from such a random selection. *See Id.* Even

though virologists knew that MA–104 was an available cell line capable of hosting the isolation of viruses from animals other than the affected species, the conventional methodology did nothing to render the use of simian cells in isolating PRRS any less counterintuitive. *See Id.*

However, the prior art in this case includes more than just the conventional methodology. At the time of the preliminary injunction hearing, Schering offered evidence that scientists had grown swine influenza on simian cells, which like PRRS, is a respiratory disease that affects pigs. This court found that the prior art generated enough doubt about the nonobviousness of the Boehringer's patent that there was substantial merit to the defense. Boehringer did nothing to dispel that conclusion because it did not to offer any reason for why one would isolate swine influenza differently than PRRS. It did argue that the viruses can be distinguished based upon zoonosis, but it did not explain why that difference "impacts upon the methodology behind growing viruses" and thus did not satisfy its burden of proof. *Boehringer,* 984 F.Supp. at 257.

Now Boehringer makes four arguments. First, it contends that no matter what the prior art teaches, it would have been impossible to know whether virologists could successfully use simian cells to isolate PRRS at the time of the invention. *See* Boehringer Br. at 17. Because the "nutritional requirements and growth characteristics of viruses are very unpredictable," Boehringer contends, "one cannot reasonabl[y] expect in advance of experimentation that any particular host cell system will be suitable for a virus in question," especially where that virus is unknown such as PRRS in 1991. *See Id.* The logic of that argument suggests that there is some universal principle that there is no prior art which could ever make obvious the isolation of any unknown virus. *See Id.* Without knowing the name of a particular virus, one could never know which cell line was viable. Here, there is no prior art identifying PRRS by name. Schering does not address this argument directly, but there is no question that it would disagree with that characterization.

Second, Boehringer has criticized Schering's reliance upon prior art related to the isolation of swine influenza. According to Dr. Bernard Easterday, no one has ever isolated true Swine Influenza virus (SIV) from pigs using simian cells. *Id.* Rather, he believes, the "overwhelming teaching in the swine flu art was to isolate and grow SIV on embryonated chicken eggs." *Id.* at 21. The 1986 edition of *Diseases in Swine,* to which Easterday contributed, lists many cell lines which have been used to culture SIV, but does not name a single simian cell. *Id.* According to Boehringer, *Diseases in Swine* is a "very well known veterinary text likely to be considered by ordinary skilled veterinary scientists interested in porcine diseases. Therefore, the absence of simian cells would have discouraged anyone investigating porcine viruses from using simian cells." *Id.* Dr. Easterday concedes that since the 1960's, "primary monkey kidney cells have been one of the most commonly used and preferred tissue culture systems for cultivating human influenza viruses" and "preferred culture systems for cultivating human influenza viruses," but he stresses the point that these were human viruses, not porcine ones.

In response, Schering asserts that true SIV has been isolated on monkey cells. *See* Defendant's Reply Br. at 7–10. Thus, there remains a question of fact as to whether scientists have isolated SIV on monkey cells. However, Schering has also asserted that even if Boehringer is correct, the prior art would still teach that "a respiratory virus which resembled a swine respiratory virus would replicate on monkey cells." *Id.* at 7. Accordingly, that would be a "teaching, suggestion and incentive for one of ordinary skill in the art to grow swine respiratory virus such as PRRS on monkey cells." *Id.* While that may be true, the court cannot ignore the existence of facts which suggest otherwise.

As Boehringer explains in its third argument, even if the prior art includes the isolation of true swine influenza ("SIV") taken from pigs, there would have been no reason for a virologist interested in PRRS to look to isolating techniques employed with SIV. The plaintiff cites several reasons for its position. Initially, regardless of the fact that

both diseases are respiratory in nature, "symptoms are not a predictor of what culture system for the virus that causes the symptoms." *Id.* at 23 (citing Easterday Decl. at ¶ 35). If that principle controls, it would seriously undermine Schering's argument that the similarities between the viruses would have taught the PRRS scientists to try the same isolating techniques. To further distinguish the two viruses, Boehringer also notes that while PRRS has a respiratory component, it is "primarily a reproductive illness." *See Id.* (citing Collins Decl. at ¶¶ 20–21). That would make SIV an entirely different disease and thus, its isolation technique would teach nothing to PRRS scientists. Finally, at the time of the invention, "seriological surveys did not implicate SIV as being associated with PRRS." *See Id.*

Schering can only prevail on its obviousness defense if it can establish, by clear and convincing evidence that the similarities between SIV and PRRS are meaningful ones. If Schering proves that virologists choose cell lines to culture viruses based upon the symptoms of the disease, it enhances its position. But, here there is a genuine issue of material fact as to the importance of focusing on symptoms. Moreover, there is also a significant question as to whether PRRS reproductive component would encourage virologists to disregard techniques for isolating SIV.

Additionally, there is evidence that other porcine respiratory viruses have been isolated on monkey cells. *See* Defendant's Reply Br. at 13. That has not been disputed, but apart from that fact, Schering has not demonstrated that the undisputed factual evidence establishes a connection between those viruses and PRRS sufficient enough to avail itself of summary judgment.

Fourth, Boehringer repeats the zoonotic argument that it made at the preliminary injunction hearing. According to Boehringer, if a virologist knows that a particular virus is non-nonzoonotic, there is "no sound rationale for trying to culture it on a non-host species (such as simian cells), much less a reasonable expectation of success that the virus would grow." *Id.* at 26. In 1991, Boehringer contends, virologists considered PRRS to be nonzoonotic because "the disease had never been known to transfer to other animals or humans." *Id.* Apparently, the disease had not infected those farmers who had worked with PRRS-infected pigs. Initially, Schering challenges this argument on its fact. According to Schering, in 1991, Boehringer scientists did not know that PRRS was nonzoonotic. *See* Schering Reply Br. at 4. Schering notes that when it classified the PRRS virus with the American Type Culture Collection in Rockville, Maryland, it did so under "Biosafety Level 2" which indicates that it is "potentially harmful to humans." *See Id.* at 4. From that, it can be inferred that Boehringer believed PRRS to be zoonotic. Thus, there is a question of fact as to whether scientific community's knew PRRS to be zoonotic. In addition to its factual weakness, Boehringer's zoonosis argument is problematic because, once again, it has failed to articulate what virologists think about zoonosis. It is unclear whether that term is even a part of a virologist's vernacular.

## 2. Conclusion

Notwithstanding Boehringer's less than formidable zoonosis argument, the foregoing indicates that there exist genuine issues of material fact which impact upon the question of whether in light of the prior art at the time, one could have reasonably expected that the PRRS virus could be grown and isolated on simian cells. *See Gillette, supra,* at 724. Much of that determination will turn on how the jury evaluates the guidance offered by prior art related to SIV. For that reason, Schering's motion for summary judgment on validity should be **DENIED**.[23]

---

**2.** Because the foregoing provides sufficient basis to deny Schering's summary judgment motion, I need not consider such secondary characteristics as commercial success of the vaccine, the long felt need for it, and evidence of copying. These factors are "invariably relevant" to a Section 103 determination (*Litton Systems, supra,* at 1569),

but do not alter the fact that there are genuine issues of material fact which prevent this court from granting summary judgment.

**3.** I note that Boehringer has requested to permission to file a surreply in response to some of the arguments made in Schering's reply brief. Be-

### 3. Schering's Judicial Estoppel Argument

The court is aware of Schering's contention that Boehringer's validity arguments should be precluded on the basis of judicial estoppel. Specifically, it takes issue with Boehringer's attempt to distinguish SIV and to argue that scientists have not isolated true SIV. Schering perceives this as an inconsistent position.

 The doctrine of judicial estoppel is an equitable doctrine, invoked by a court in its discretion: to "preserve the integrity of the judicial system by preventing parties from playing fast and loose with the courts in assuming inconsistent positions, and with a recognition that each case must be decided on its own particular facts and circumstances." *McNemar v. The Disney Store,* 91 F.3d 610, 617 (3d Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 958, 136 L.Ed.2d 845 (1997). The doctrine is not intended to eliminate all inconsistencies but only those where the litigants are playing "fast and loose." *Ryan Operations v. Santiam–Midwest Lumber,* 81 F.3d 355 (3d Cir.1996). The Supreme Court has stated:

> [i]t may be laid down as a general proposition that, where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him.

*Fleck v. KDI Sylvan Pools, Inc.,* 981 F.2d 107, 121 (3d Cir.1992) (quoting *Davis v. Wakelee,* 156 U.S. 680, 689, 15 S.Ct. 555, 39 L.Ed. 578 (1895)). "Judicial estoppel looks to the connection between the litigant and the judicial system" and thus, it is intended to protect the courts rather than the litigants. *Id.* at 121–22.

 There is no question that Boehringer's validity arguments have evolved from the beginning of this case, but I do not find them inconsistent. Originally, Boehringer took the position that the prior art did not teach that simian cells could be used to grow or isolate porcine respiratory viruses. At the preliminary injunction hearing, when confronted with evidence submitted by Schering that porcine viruses such as swine influenza and rotaviruses, Boehringer distinguished these viruses on the basis of zoonosis. Whether that is a meaningful distinction is uncertain. For the instant motion, Boehringer has accumulated more evidence and attacked the SIV prior art directly. Unquestionably, as this case has progressed, Boehringer has modified its position, but these positions have never been antithetical to each other. Boehringer has always maintained that all prior art is distinguishable. I do not find that the evolution of Boehringer's arguments reflect an attempt to play fast and loose with the court.

Schering wants the court to conclude that because, at the time of the preliminary injunction hearing, Boehringer conceded that swine flu had been isolated on monkey cells, that it should be precluded from making these arguments. Schering's argument is unavailing. At the previous hearing, Boehringer did accept that some form of swine flu had been isolated on monkey cells in a way that might be construed as a wholesale adoption of Schering's position. However, the court is cognizant of the fact that at the time of the preliminary injunction hearing, it made its decision without all of the evidence which may come out at trial. *See Boehringer,* 984 F.Supp. at 258. For the instant motion, Boehringer benefited from further discovery. Schering may treat Boehringer's recent stance as somewhat of a retreat, but it actually reflects an effort to clarify its position in order to illustrate important differences. The court has an institutional interest in obtaining full knowledge of the prior art and in learning about the pertinent differences. It is understandable that once discovery is completed, the prior art universe would be more textured. The court sees no reason to invoke judicial estoppel.

### C. Boehringer's Preliminary Injunction Motion

Boehringer has renewed its request for a preliminary injunction on the ground that Schering's validity no longer has substantial

cause I have denied summary judgment, further briefing is unnecessary.

merit. There is no question that the evidence submitted and the arguments made by Boehringer arguably undermines Schering's defense. Now there are more questions as to the value of the prior art is distinguishable, but for reasons discussed above, Boehringer has not conclusively distinguished the prior art. Boehringer has not demonstrated that the validity defense is devoid of substantial merit. Moreover, it is far from certain that Boehringer would be likely to succeed on the merit of its infringement claim. As the court indicated in its infringement analysis, Boehringer cannot establish literal infringement and it will encounter difficulties in proving satisfying the elements of the doctrine of equivalents. Finally, Boehringer has not satisfied its burden with respect to irreparable harm. *See Boehringer,* 984 F.Supp. at 264. Thus, Schering's request shall be **DENIED.**

## *IV. Conclusion*

For reasons detailed in the opinions above, the motions for summary judgment are **DENIED** and plaintiff's motion for a preliminary injunction is **DENIED.**