**BOEHRINGER INGELHEIM VETMEDICA, INC., et al., Plaintiffs,**

v.

**SCHERING–PLOUGH CORPORATION and Schering Corporation, Defendants.**

**Civ. No. 96–4047(HAA).**

United States District Court, D. New Jersey.

Sept. 21, 2001.

H. Curtis Meanor, Gregory D. Miller, Podvey, Sachs, Meanor, Catenacci, Hildner & Cocoziello, Newark, NJ, Jennifer Gordon, Jonathan A. Marshall, Mr. Scott D. Stimpson, Pennie & Edmonds, New York City, for Plaintiffs.

Sidney David, Paul H. Konchanski, Lerner, David, Littenberg, Krumholz & Mentlik, Westfield, NJ, for Defendants.

## AMENDED OPINION

ACKERMAN, Senior District Judge.

This matter comes before the court upon motions of Defendants Schering–Plough Corporation and Schering Corporations ("Schering" or "defendants") for judgment as a matter of law and for a new trial. Plaintiff, Boehringer Ingelheim Vetmedica, Inc., ("Boehringer" or "plaintiff") opposes these motions. For the reasons stated below, these motions are DENIED.

### Background

#### A. Factual Background

This patent litigation arises from the efforts of Boehringer and of Schering to develop a vaccine for a disease known as Porcine Reproductive Respiratory Syndrome ("PRRS"). This disease infects pigs and causes them to give birth to dead or sickly piglets. In addition, it causes reproductive failure, respiratory disease, and other symptoms such as anorexia, fever, dyspnea and neurological impairment. In previous opinions issued in this case, this court has discussed at greater length the general process by which vaccines are developed and the respective parties' efforts to develop vaccines. The court presumes the reader's familiarity with those discussions. See, e.g., *Boehringer Ingel-heim v. Schering–Plough,* 984 F.Supp. 239, 243 245. On December 19, 1995, the United States Patent Office ("USPO") issued Boehringer Patent No. 5,476,778 ("'778 Patent").

In this case, Boehringer claims that Schering's sales of a swine vaccine infringed upon claims 1 and 2 of Boehringer's '778 Patent, both literally and under the doctrine of equivalents. Claims 1 and 2 were as follows:

1. A method of growing and isolating swine infertility and respiratory syndrome virus, ATCC–VR2332, which comprises inoculating the virus on a full or partial sheet of simian cells in the presence of a serum in a suitable growth medium and incubating the inoculated cell sheet at about 34 [degrees] C. to 37 [degrees] C. until CPE[1] is observed.

2. The method as recited in claim 1 wherein the simian cell line is MA–104.

In November 1998, while the litigation of this infringement action was pending, the USPO issued to Boehringer Patent No. 5,840,563 ("'563 Patent"), also for a method of growing PRRS. On December 17, 1998 Boehringer commenced an action, 1998–CV–5703, alleging that Schering had infringed Claim 3 of its newly issued '563 Patent.

#### B. Procedural History

Plaintiff filed its original complaint in this matter in August 1996. In June 1997, this Court held a hearing pursuant to *Markman v. Westview Instruments, Inc.,* 52 F.3d 967 (Fed.Cir.1995) in conjunction with its hearing on Boehringer's motion

---

1. In *Boehringer I,* this court noted that "CPE refers to 'cytopathic effect' which the plaintiff has defined as a 'change in the microscopic appearance of a cell after infection with a virus' or some observable effect shown on the simian cells. As the defendant has explained, this observable effect is the killing of inoculated cells." *Id.* at 244.

for a preliminary injunction. Since that time, the court has issued several written opinions in this case and one opinion in the related case 1998–CV–5703. *See Boehringer Ingelheim v. Schering–Plough*, 984 F.Supp. 239 (D.N.J.1997) (hereinafter *"Boehringer I"*); *Boehringer Ingelheim v. Schering–Plough*, 6 F.Supp.2d 324 (D.N.J. 1998) (hereinafter *"Boehringer II"*); *Boehringer Ingelheim v. Schering–Plough*, 68 F.Supp.2d 508 (D.N.J.1999) (hereinafter *"Boehringer III"*); *Boehringer Ingelheim v. Schering–Plough*, 106 F.Supp.2d 667 (D.N.J.2000) (hereinafter *"Boehringer IV"*); *Boehringer Ingelheim v. Schering–Plough*, 106 F.Supp.2d 696 (D.N.J.2000) (hereinafter *"Boehringer V"*).

On October 6, 1997, this Court issued an opinion detailing its claim construction under *Markman* and denying Boehringer's preliminary injunction motion in the '778 Patent case. In denying Boehringer's motion for a preliminary injunction, the court found that Boehringer failed to demonstrate a likelihood of success on the merits given Schering's substantial defense of obviousness pursuant to 35 U.S.C. § 103(a), and that Boehringer failed to demonstrate irreparable harm from the defendants' sale of a competing swine vaccine. The court also found, however, that Boehringer did not engage in certain inequitable conduct in the prosecution of the patent. *See Boehringer I*, 984 F.Supp. at 258–59, 264. On April 27, 1998, this court denied Schering's motion for summary judgment and Boehringer's motion for summary judgment, as well as Boehringer's renewed motion for a preliminary injunction in the '778 Patent case. *See Boehringer II*, 6 F.Supp.2d 324. The court found that neither Schering nor Boehringer had demonstrated that no genuine issues of material fact remained regarding obviousness and infringement pursuant to the doctrine of equivalents, and that Boehringer still had not demonstrated irreparable harm or its

likelihood of success on the merits. *Id.* at 338.

On October 26, 1999, this court denied Boehringer's preliminary injunction motion in the '563 Patent case, finding that Boehringer failed to demonstrate a likelihood of success on the merits given Schering's substantial defenses of obviousness and inequitable conduct on the part of Boehringer in obtaining the patent, and that Boehringer had failed to show irreparable injury. *See Boehringer III*, 68 F.Supp.2d 508. Boehringer appealed the court's decision to the Federal Circuit, who dismissed the appeal on February 22, 2000.

On June 20, 2000, this Court issued an opinion holding that Boehringer did not engage in inequitable conduct in obtaining the '778 Patent, finding that Schering failed to demonstrate that Boehringer's inclusion of third parties' work in an application section rather than citing that work as prior art, and Boehringer's failure to disclose two references which suggested a cause of swine disease was not material. The court also found that Schering had not demonstrated plaintiff's intent to deceive. *See Boehringer IV*, 106 F.Supp.2d 667.

Prior to trial on the issues effecting the '778 Patent, this Court severed the issue of inequitable conduct from the issues of obviousness and infringement. The issues of obviousness and infringement were tried by a jury, and on January 20, 2000 the jury returned a verdict in favor of Boehringer on those issues. The issue of inequitable conduct was tried by this Court sitting without a jury, and on June 20, 2000, this court entered judgment in favor of Boehringer on that issue. Within 10 days of that Order being entered, Schering moved for a new trial pursuant to Rule 59 and for a judgment as a matter of law pursuant to Rule 50. Boehringer filed pa-

pers opposing those motions. On August 2, 2000, this court granted Boehringer's motion for injunctive relief in the '778 Patent case and found that Schering's post-trial motions were timely but that Schering was not entitled to stay of this case pending resolution of its post-trial motions. *See Boehringer V*, 106 F.Supp.2d 696.

On August 16, 2000, this court issued an order staying all proceedings in the '563 Patent case pending resolution of appeals in the '778 Patent case. On August 28, 2000, this court subsequently issued an order administratively terminating the '563 patent case "without prejudice to the right of the parties to reopen the proceedings for good cause shown."

Schering brings its renewed motion for judgment as a matter of law pursuant to Fed.R.Civ.P. 50(b). During trial Schering had filed notice of a motion for judgment as a matter of law pursuant to Fed. R.Civ.P. 50(a), on the grounds that Boehringer failed to produce evidence that its commercial process of incubating for XX hours [2] is equivalent to the claim requirement of "incubating . . . until CPE is observed" or evidence that its vaccine strain ATCC–VR2525 is equivalent to the claimed virus strain ATCC–VR2332. On December 16,1999, the Court indicated that it reserved opinion on that motion. In its renewed motion, Schering alleges that its commercial process of incubating for XX is not equivalent to the claim requirement of "incubating . . . until CPE is observed." Schering also alleges that its vaccine strain ATCC–VR2525 is not equivalent to the claimed virus strain ATCC–VR2332. Finally, Schering asserts that claim 2 of the '778 Patent is invalid for obviousness. Boehringer opposes each of

Schering's assertions and contends that Schering has failed to prove that there was no rational basis for the jury's findings of equivalency and obviousness.

Likewise Schering brings its motion for a new trial pursuant to Fed.R.Civ.P. 59. Schering contends that the jury's findings of equivalency were contrary to the great weight of evidence, that the trial was permeated by improper, irrelevant, and one-sided evidence concerning Boehringer's vaccine, and that the brevity of the jury's deliberations confirms the need for a new trial. In response, Boehringer argues that it provided conclusive proofs of infringement under the doctrine of equivalents at trial, that its references to its vaccine were explicitly permitted by the court's orders and were limited and appropriate, rather than prejudicial, and finally that the duration of the jury deliberations does not warrant a new trial.

On December 4, 2000, however, just over five months after filing the above motions, Schering wrote to the court to request that decisions on its post-trial motions be held in abeyance pending briefing by both parties on the impact of an *en banc* decision issued by the Federal Circuit on November 29, 2000, *Festo Corporation v. Shoketsu Kinzoku Kogyo Kabushiki and Co., Ltd.*, 234 F.3d 558 (Fed.Cir.2000). Schering asserts that the *Festo* decision overruled prior Federal Circuit precedents by placing new and significant limitations on the doctrine of equivalents. Boehringer subsequently wrote to the court, objecting to further delays in consideration of the post-trial motions on the grounds that the *Festo* decision only addressed the impact of amendment-based prosecution-history estoppel on the application of the doctrine

---

**2.** The exact number of hours during which the Schering process operates has been filed under seal.

of equivalents. Since the claim Schering was found to have infringed was never amended during the prosecution of the '778 patent, Boehringer contends that "prosecution history estoppel is simply irrelevant to this case." Schering, however, argues that *Festo* equated argument and amendment based prosecution history estoppel and therefore *Festo's* limitation on the doctrine of equivalents would also apply to argument-based prosecution history estoppel.

This court will address the impact of the Festo decision on this case and then turn to Schering's post-trial motions.

### Legal Standard

1. Festo's *impact on the Doctrine of Equivalents*

One important function of a patent is to provide notice to the public as to which devices or methods would and would not infringe upon that patent. Greater certainty is thought to protect enterprise and experimentation, since competitors can proceed with a clear understanding of what would constitute infringement. *See Markman v. Westview Instr., Inc.,* 517 U.S. 370, 390, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996). The courts have also found, however, that literal interpretation of patent claims does not always provide the necessary protection to patent holders. For instance, claimants may make only insubstantial changes to an invention, thereby avoiding literal infringement but effectively copying a patented method or device. *See Graver Tank & Mfg. Co. v. Linde Air Prods. Co.,* 339 U.S. 605, 607–608, 70 S.Ct. 854, 94 L.Ed. 1097 (1950). In order to protect against such an abuse of the patent system, the courts have developed the doctrine of equivalents. Under this doctrine, a patent claim is infringed if an equivalent element of each element of a patented claim is present in the allegedly infringing device or method. *See Pennwalt Corp. v. Durand–Wayland, Inc.,* 833 F.2d 931, 935 (Fed.Cir.1987) (en banc).

■ This doctrine has been limited to prevent it from broadening or expanding the claims of a patent. *Warner–Jenkinson Co., Inc. v. Hilton Davis Chemical Co.,* 520 U.S. 17, 29, 117 S.Ct. 1040, 137 L.Ed.2d 146 (1997). Therefore, in order to be found equivalent, the differences between a specific element of the accused device or method and the claimed element must be insubstantial. *Id.* Every element of a claim must be represented either literally or by an equivalent, and the determination of equivalency is applied on an element-by-element basis. *Pennwalt Corp.,* 833 F.2d at 935.

■ One restraint on the application of the doctrine of equivalents is prosecution history estoppel. According to the Federal Circuit, "[p]rosecution history estoppel precludes a patentee from obtaining under the doctrine of equivalents coverage of subject matter that has been relinquished during the prosecution of its patent application," either by amendments or by "arguments made to obtain allowance of the claims at issue." *See Pharmacia & Upjohn Co. v. Mylan Pharmaceuticals, Inc.,* 170 F.3d 1373, 1376–77 (Fed.Cir.1999).

Over the last twenty years, the Federal Circuit has wrestled with the degree of estoppel applicable when parties amend claims to exclude more than was necessarily required in order to obtain a patent. In *Hughes Aircraft Co. v. United States,* 717 F.2d 1351 (Fed.Cir.1983), the Federal Circuit found that courts should only permit estoppel to the extent that a claim was narrowed in order to demonstrate that the claim was not obvious in light of prior art. Equivalents of the unnecessarily excluded claims could still infringe upon the patent. In *Kinzenbaw v. Deere & Co.,* 741 F.2d 383

(Fed.Cir.1984), however, the Federal Circuit did not consider the extent to which an amendment was or was not necessary to obtain a patent, but instead ruled that a prior claim amendment entirely precluded the application of the doctrine of equivalents to the amended element. Nevertheless, the Federal Circuit tended to apply the more flexible rule in *Hughes Aircraft* rather that the strict bar in *Kinzenbaw* in the following years. *See Festo* at 572–74.

In its *Festo* opinion, however, the Federal Circuit, sitting en banc, indicated that its twenty years of experience with the "flexible bar" approach enunciated in Hughes Aircraft had demonstrated that the flexible bar approach was difficult to apply and failed to provide notice of patented claims to the general public, because it was impossible to anticipate the extent of a patented claim under the flexible bar standard. *Id.* at 574–75. The co-existence of the flexible and strict bar standards also caused considerable confusion. *Id.* As a result, the Court explicitly reversed its longstanding practice and sharply limited the application of the doctrine of equivalents with respect to amended claim elements, holding that any amendment that narrows the scope of a claim automatically precludes the application of the doctrine of equivalents to the amended claim element. *Id.* at 569. The court further held that amendments made for reasons "substantially related to patentability" are not limited to amendments made to avoid prior art, but include any amendment related to a statutory requirement for a patent. *Id.* at 566. Finally, the court found that voluntary amendments should be treated in the same way as amendments required by the examiner and that "unexplained" amendments foreclose recourse to the doctrine of equivalents. *Id* at 568, 578.

The question, then, is how does *Festo* impact the instant case. Schering asserts that prior to the *Festo* decision, prosecution history estoppel was limited solely to instances in which a patentee has attempted to overcome prior art under § 102 or § 103. According to Schering, *Festo* clarified that prosecution history estoppel may also arise when a patentee has attempted to overcome other statutory rejections relating to patentability, including rejections under 35 U.S.C. § 101 and § 112. Finally, *Festo* clarified that prosecution history estoppel is a legal question to be determined by the Court based solely upon consideration of the public record of a patent's prosecution history.

Schering contends that Boehringer made two limiting arguments in prosecuting its patent. The first was in response to a utility rejection which indicated that "[t]he specification provides insufficient evidence that the infectious agent is the etiological agent of mystery swine disease. From the prior art it is not clear for example that the virus as described in the specification is a contaminant, infective with a combination of other agent(s) and/or that several other viruses cause the disease." In argument, Boehringer stated that it had provided evidence that the infectious agent was the etiological agent of mystery swine disease.

The second allegedly limiting argument was in response to a best mode rejection which stated that "because it is not clear that the virus isolate VR2332, possessing the biological properties of causing Mystery Swine Disease is known and publicly available ... and because the best mode disclosed by the specification requires the use of the virus, a suitable deposit for patent purposes is required." In response, Boehringer filed a Chaldek declaration, as Schering puts it, "to evidence compliance with the deposit requirements of the Budapest Convention." *See* Scher-

ing's letter to the court dated December 18, 2000.

 As a result of these two limiting arguments, Schering contends that under *Festo*, Boehringer is estopped from arguing an equivalency for the ATCC–VR2332 limitation. Boehringer replies that *Festo* did not address argument-based prosecution history, and that in any case this court found that Boehringer did not surrender anything to obtain its patent. This court agrees that *Festo's* holding on amendment based estoppel does not apply to the facts of this case, but on grounds different than those articulated by Boehringer.

At its *Markman* hearing, this court addressed two claims by Schering regarding the significance of the term "swine infertility and respiratory syndrome virus, ATCC–VR2332" located in the preamble of claim 1. The court found that the plain language of the patent preamble itself limited the patent to the ATCC–VR2332 strain of the virus. *See Boehringer I* at 248–250. This court did not make findings regarding the impact of the prosecution history on whether or not the patent was limited to a particular strain, except to note that the strain of the virus was essential to the claimed invention throughout the prosecution of the patent. The only finding the court made based on the prosecution history of the patent was that the prosecution history did not indicate that the patent was limited to virulent strains of the virus, but instead encompassed virulent and non-virulent strains. *Id.* at 249–251.

Therefore, the patent, as interpreted at the *Markman* hearing, is narrow on its face, rather than as a result of surrendering material in the course of the patent prosecution. The fact that the strain was essential to the prosecution of the patent and that it was formally deposited as evidence of the viability of the art and its best method, is consistent with a patent which is literally limited to a particular strain of the virus. Such references are not evidence that Boehringer surrendered broader claims when prosecuting the patent in order to obtain the patent. Boehringer is not subject to prosecution history estoppel since it has not surrendered anything via prosecution history to obtain its patent; the original language of its claim supplied the limitation.

As a result, neither of the court's findings at the *Markman* hearing regarding the virus strain are implicated by *Festo*. In fact, the limitation the court found in the literal language of the patent preserves Boehringer's ability to assert the doctrine of equivalents as to that element. As Judge Plager noted in a concurring opinion in *Festo*, narrowly drawn patent claims which have not been subject to amendment are not impacted by the *Festo* decision. Instead, infringement of such narrowly drawn claims will continue to be litigated under the doctrine of equivalents. *See Festo* at 592–93. According to Judge Plager, one unintended consequence of the *Festo* opinion may be that while literal infringement claims become harder to prove, litigation under the doctrine of equivalents will significantly increase, "especially in those cases in which the patent application, containing narrowly drawn claims, was approved without any amendment in the area that affects the accused product." The Judge observed:

> The patentee may have little choice but to insist on enforcement under the doctrine of equivalents, if the patent is to be enforced at all. Since today's decision does not change the basic rule of analysis for infringement claims under the doctrine of equivalents, the outcome in those cases will continue to be tested under the pre-existing "insubstantial differences" and its surrogate "function-

way-result," with all the game-playing those indeterminate phrases provide. *Id.* at 592–593.

While the Federal Circuit is clearly dissatisfied with the indeterminancy created by the doctrine of equivalents as it is currently understood, *Festo* did not alter the application of that doctrine in cases such as this one, in which the party seeking to establish infringement never surrendered claims during the prosecution of the patent, and may not therefore be estopped by its surrender.

As a result, this court need not reach Schering's contention that argument based estoppel is encompassed by the *Festo* opinion.

### 2. *Rules 50 and 59*

As noted above, Schering has brought motions under Rules 50 and 59 of the Federal Rules of Civil Procedure. Because motions brought under these rules are not unique to patent law, the law of the Third Circuit, not the Federal Circuit, controls. *See, e.g., Wahpeton Canvas Co., Inc. v. Frontier, Inc.* 870 F.2d 1546, 1552 n. 8 (Fed.Cir.1989); *see also Tate Access Floors, Inc. v. Maxcess Tech., Inc.*, 222 F.3d 958, 964 (Fed.Cir.2000) (applying the regional circuit judgment-as-a-matter-of-law standard used by the district court).

Motions for judgment as a matter of law in jury trials are governed by Rule 50 of the Federal Rules of Civil Procedure. According to Rule 50, "If during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, the court may determine the issue against that party and may grant a motion for judgment as a matter of law against that party . . .".

█ According to the United States Supreme Court, in deciding a motion for judgment·as a matter of law, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). "[A]lthough the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Id.* The Third Circuit has found that the trial judge must determine "whether the evidence and justifiable inferences most favorable to the prevailing party afford any rational basis for the verdict." *Bhaya v. Westinghouse Elec. Corp.*, 832 F.2d 258, 258–59 (3d Cir.1987). The motion may be granted if "the record is critically deficient of that minimum quantity of evidence from which a jury might reasonably afford relief." *Hopp v. City of Pittsburgh*, 194 F.3d 434, 439 (3d Cir.1999).

█ Rule 59 provides that "a new tri-·al may be granted . . . in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States." Although not expressly enumerated, the general grounds for granting a new trial are that the verdict is against the weight of the evidence, that the damages are excessive, or that for some other reason the trial was unfair. A motion for new trial may also raise questions of law arising out of substantial errors in the admission or rejection of evidence or the giving or refusal of jury instructions. *See* Wright & Miller, 11 Federal Practice and Procedure § 2805. This list is not exhaustive and other grounds for new trial may be asserted, but the only grounds argued by the defendant in this motion are that the jury's verdict was against the weight of the evidence, that despite the court's efforts the

trial was permeated by impermissible and prejudicial references to Boehringer's vaccine, and that the jury deliberations were unreasonably quick.

 It should be noted that the standard for granting a new trial is less demanding than the standard for granting a judgment as a matter of law. *See Lightning Lube, Inc. v. Witco Corp.*, 802 F.Supp. 1180 (D.N.J.1992). Unlike the motion for judgment as a matter of law, a motion for new trial is generally entrusted to the discretion of the trial court. *See Greenleaf*, 174 F.3d at 365–66; *Allied Chemical Corp. v. Daiflon, Inc.*, 449 U.S. 33, 36, 101 S.Ct. 188, 66 L.Ed.2d 193 (1980). Moreover, the court should examine a verdict more closely when a trial involves complex and specialized information. According to the Third Circuit:

> Where a trial is long and complicated and deals with a subject matter not lying within the ordinary knowledge of jurors a verdict should be scrutinized more closely by the trial judge than is necessary where the litigation deals with material which is familiar and simple, the evidence relating to ordinary commercial practices. An example of subject matter unfamiliar to a layman would be a case requiring a jury to pass upon the nature of an alleged newly discovered organic compound in an infringement action.

*Lind v. Schenley Indus. Inc.*, 278 F.2d 79, 90–91 (3d Cir.1960). The trial court's discretion, however, is not without limits. Indeed, the grant of a new trial because the verdict is against the weight of the evidence is only appropriate when "the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks our conscience." *Greenleaf*, 174 F.3d at 366 (quoting *Williamson v. Consolidated Rail Corp.*, 926 F.2d 1344, 1353

(3d Cir.1991)). This standard serves to prevent usurpation of the jury's prime function as the trier of fact and ensures that the "district court does not substitute its 'judgment of the facts and the credibility of the witnesses for that of the jury.'" *Fineman v. Armstrong World Indus., Inc.*, 980 F.2d 171, 211 (3d Cir.1992) (quoting *Lind v. Schenley*, 278 F.2d 79, 90 (3d Cir.1960)).

### *Application*

#### 1. *Waiver*

Boehringer asserts that Schering waived many of the arguments in its Rule 50(b) motion because Schering failed to make those arguments in either its oral or its written Rule 50(a) motions. Rule 50 provides that: "[m]otions for judgment as a matter of law may be made at any time before submission of the case to the jury. Such a motion shall specify the judgment sought and the law and the facts on which the moving party is entitled to the judgment."

 Further, subsections (b) and (c) of Rule 50 refer to the motion for judgment as a matter of law as a "renewed motion," made only after previously making such a motion at the close of all the evidence. Thus, in order to raise a Rule 50 motion after trial, the plaintiff must first move pursuant to Rule 50 at the close of all the evidence. *See Greenleaf*, 174 F.3d at 364 (citing *Lowenstein v. Pepsi–Cola Bottling Co. of Pennsauken*, 536 F.2d 9, 11 (3d Cir.1976)); *Mallick v. Int'l Brotherhood of Electrical Workers*, 644 F.2d 228, 233 (3d Cir.1981); *Scully v. Borough of Hawthorne*, 58 F.Supp.2d 435, 445 (D.N.J. 1999). Likewise, any ground that is not included in a Rule 50(a) motion at the close of evidence cannot be raised in a renewed motion for judgment as a matter of law. *See Acosta v. Honda Motor Co., Ltd.*, 717 F.2d 828, 831–32 (3d Cir.1983); *Chemical*

*Leaman Tank Lines, Inc. v. Aetna Casualty and Surety Co.,* 89 F.3d 976, 992–3 (3d Cir.1996). The purpose of the specificity requirement of Rule 50(a)(2) is to provide notice to a party of potential defects in its proofs in time for that party to cure those defects. *Acosta,* 717 F.2d at 831–32. This court must therefore determine if Schering argued the factual components of its claim in a way which notified Boehringer of "the legal rubric under which [Schering] planned to proceed." *See Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.,* 140 F.3d 494, 519 (3d Cir.1998); *Fineman v. Armstrong World Industries, Inc.,* 980 F.2d 171, 184 (3d Cir.1992).

This court finds that Schering addressed each of its general arguments in its Rule 50(a) motions, and, further, it raised many of the details and supporting facts in its Rule 50(a) motion. In both motions, Schering challenged the sufficiency of the evidence that Boehringer produced with respect to the equivalency of Schering's step of incubating and of Schering's vaccine strain ATCC–VR2525, and also contended that Schering had established a defense of obviousness. Boehringer does not suggest that Schering did not raise these arguments, but instead argues that Schering did so in insufficient detail to provide notice to Boehringer of Schering's post-trial arguments. Specifically, Boehringer faults Schering for not going into greater detail in its critique of Dr. Hesse's testimony in the Rule 50(b) motion than in the Rule 50(a) motion. Boehringer also asserts that Schering's 50(a) motions do not address Dr. Dubovi's analysis of significant, good and strong CPE, his analysis of Schering's production documents, and his function/way/result comparison. Yet, on page five of its written Rule 50(a) motion, Schering specifically faults Dr. Dubovi's analysis of Schering's production documents. Boehringer further asserts that Schering did not mention the CPE obser-

vations from Schering production runs; however, pages six through eight of Schering's Rule 50(a) motion detail its objections to testimony about those runs.

Almost all of the support for Schering's arguments which Boehringer claims is absent from Schering's Rule 50(a) motion regarding the ATCC–VR2332 element may in fact be found in either Schering's oral or written Rule 50(a) motion. On pages ten through eleven of the written 50(a) motion, Schering addresses Dubovi's testimony on equivalency; on page twelve, Schering argued that Boehringer had not met its burden of producing factual evidence as to the similarity of the two strains; finally, in its oral motion, Schering raised its obviousness arguments. *See* Plaintiff's Opposition to Schering's Renewed Motion for Judgment as a Matter of Law, Ex. A, 17.62. Schering further noted that its opposition to Boehringer's own Rule 50 motion detailed several of its arguments on these issues. *See id.* At 17.57.

The only contention missing from its Rule 50(a) motion is Schering's claim that the patent office's issuance of a patent for ATCC–VR2525 virus is evidence that ATCC–VR2525 is substantially different from ATCC–VR2332. Schering's contention regarding the patentability of ATCC–VR2525 supports Schering's claim that Boehringer had not provided sufficient evidence of equivalency. Boehringer was well aware of the overall claim, and Schering's assertion of the significance of the patentability of ATCC–VR2525 is a predictable supporting argument for that overall claim.

 Schering does augment its support for some of its 50(a) arguments in its 50(b) motion; however, Rule 50 does not require precise correspondence between Schering's Rule 50(a) and Rule 50(b) motions. Indeed, the court has found that a

party has been provided notice in a Rule 50(a) motion on the basis of far more general assertions than those of Schering's Rule 50(a) motions. *See Fineman,* 980 F.2d at 184, (finding that by referring in a 50(a) motion to the insufficiency of evidence provided as to two claims, but only further arguing in detail one claim, defense attorney provided sufficient notice of both claims to support a 50(b) motion); *Acosta,* 717 F.2d at 832 (finding that a defendant's motion for a directed verdict on "the remaining counts ... under 403(1) theory which is ... strict liability" provided sufficient notice in light of plaintiff's response indicating that plaintiff and the court understood to which counts the defendant was referring and was able to make sufficiency of evidence arguments on each count); *Brokerage Concepts,* 140 F.3d at 519 fn. 18 (finding that a Rule 50(a) challenge to the sufficiency of evidence to support a finding of an unreasonable restraint of trade provided sufficient notice, in the context of the case at large to support a Rule 50(b) challenge to the sufficiency of the evidence of anticompetitive effects in the tied market).

In cases cited by Boehringer, a party's Rule 50(b) motion failed because that party raised new arguments in its Rule 50(b) motion, rather than because the parties provided more detailed arguments. *See Chemical Leaman Tank Lines, Inc. v. Aetna Casualty and Surety Co.,* 89 F.3d 976, 992–2 (3d Cir.1996) (finding that an objection to a jury charge that was not treated as a rule 50(a) motion by the court cannot serve as notice of an argument in a rule 50(b) motion); *Lightning Lube, Inc. v. Witco Corp.,* 4 F.3d 1153, 1173 (3d Cir. 1993) (finding that defendant's proximate cause arguments in its rule 50(a) motion did not provide notice of defendant's foreseeability arguments in its Rule 50(b) motion). Such is not the case here; moreover, Boehringer has not indicated that it

was surprised or that it would have provided further evidence had it known that these arguments existed. Therefore, this court finds that Boehringer had clear notice of the legal rubric under which Schering proceeded in its Rule 50(b) motions, and, as a result, that Schering has not waived any of those arguments.

### 2. Schering's Rule 50(b) motion

Schering asserts that Boehringer has not produced sufficient evidence for the jury to find that Schering's commercial process of incubating for XX is equivalent to the claim requirement of "incubating ... until CPE is observed." Schering also contends that Boehringer has not produced enough evidence for the jury to find that Schering's vaccine strain ATCC–VR2525 is equivalent to the claimed virus strain ATCC–VR2332. Finally, Schering asserts that claim 2 of the '778 patent is invalid for obviousness. The court will address each of Schering's contentions in turn.

As noted in the discussion of the doctrine of equivalents above and in *Boehringer II,* in order to be found equivalent, the differences between a specific element of the accused device or method and the claimed element must be insubstantial. *Warner–Jenkinson,* 520 U.S. at 29, 117 S.Ct. 1040. Every element of a claim must be represented either literally or by an equivalent, and the determination of equivalency is applied on an element-by-element basis, not to the invention as a whole. *Pennwalt Corp.,* 833 F.2d at 935. This does not mean, however, that the court should ignore the element's function in the patent. *See Warner–Jenkinson Co.* 520 U.S. at 24–25, 117 S.Ct. 1040 (*citing Graver Tank & Mfg. Co. v. Linde Air Products Co.,* 339 U.S. 605, 609, 70 S.Ct. 854, 94 L.Ed. 1097 (1950)). As the Supreme Court noted, "Consideration must be given

to the purpose for which an ingredient is used in a patent, the qualities it has when combined with the other ingredients, and the function which it is intended to perform. An important factor is whether persons reasonably skilled in the art would have known of the interchangeablity of an ingredient not contained in the patent with one that was." *Id.*

■ Equivalency may be identified via a "function-way-result" analysis, which examines "the function served by a particular claim element, the way that element serves that function, and the result thus obtained by that element." (*Warner–Jenkinson,* 520 U.S. at 39, 117 S.Ct. 1040) or via an insubstantial differences analysis. The linguistic framework used is less important than the underlying inquiry into whether the product or process contains elements equivalent to each claimed element of the patented invention. *Id.* at 40, 117 S.Ct. 1040.[3]

The court's prior opinions have framed the issue of equivalency with respect to the element "until CPE is observed." After holding a *Markman* hearing, the court interpreted the claim language "until CPE is observed." *See Boehringer I* at 252–53. The court found that the claim language did not suggest that the process should stop immediately after the initial observation of CPE, but neither should the process be "continued indefinitely without considering CPE." *Id.* at 252–53.

In deciding motions for summary judgment filed by each party on the issues of infringement of the element "until CPE is observed," this court laid out the issues of fact which had been agreed upon by the parties and those which were reserved for determination by the jury. *See Boehringer II* at 331–332. The court interpreted the element "until CPE is observed" to require "that the patented process terminate at the moment some significant degree of CPE, either 'strong' or 'good' is observed." *Boehringer II,* 6 F.Supp.2d at 329. The court found that the parties had agreed that significant CPE occurs between 25% and 75% CPE. Schering documents also indicated that at optimal growth, there is typically "PRRS CPE ... encompassing 50–75%." *Id.* at 330. In addressing the timing of the development of significant CPE, the court found that 25% CPE may occur after two days, but that it may also take XX days for 25% CPE to develop. *Id.* At XX hours, CPE ranges from 25 to 75%. *Id.*

With respect to literal infringement, the court found no material issues of fact because "[b]atches taken from the Schering process range from 25% to 75% and thus, it cannot be argued that the process is focussed exclusively on reaching some degree of CPE The observation of CPE, while arguably important, plays a less central role in Schering's vaccine production process." *Id.* at 331.

**3.** Schering contends that this court had previously determined that it would only apply the substantial/insubstantial differences analysis in this case, citing *Boehringer II,* 6 F.Supp.2d at 329. In that opinion, however, this court simply stated that it would "follow the standards established in *Hilton Davis* and *Sofamor[Danek Group, Inc. v. DePuy–Motech, Inc.,* 74 F.3d 1216 (C.A.Fed.1996)]* ." *Id.* The court cited those cases for the proposition that "the traditional 'triple identity' test might not be 'the test' and in some instances, may not end the inquiry." *Id.* At most, the court indicated

through this analysis that it intended to apply the insubstantial differences test as well as the triple identity test in the instant case. Moreover, as Boehringer notes in its Sur-reply to Schering's Renewed Motion for Judgment as a Matter of Law (hereinafter "Sur-reply"), Schering itself requested that the court instruct the jury to apply this test in its proposed jury instructions. *See* Sur-reply, Ex. A—B. Schering also argued about the evidence of function, way and result in its closing argument. Tr. At 18.87:16–18.88:2.

With respect to equivalency, the court found that each element of the two processes serves the function of indicating when to terminate the respective process. Schering asserts, however, that the way of terminating the growing process and the result obtained are totally different, because Schering relies on a timing device to produce a significant amount of the virus, while Boehringer relies on visual observation to produce a significant amount of CPE. Boehringer contends that Schering's timing device is simply another way of measuring CPE, and that CPE is a method of anticipating the amount of virus which may be produced from a batch of cells.

The court reserved for the jury the issues of whether significant CPE generally occurs at the XX hour period employed by Schering, or if it appears well before that time. The court also found that the appearance of 25% CPE marked the appearance of significant CPE, but that if the jury found that 25% CPE and 50% CPE are equivalent, then the appearance of 50% CPE could also mark the appearance of significant CPE. The court further observed that the jury could find that the appearance of CPE at the time set by Schering is merely fortuitous.

At trial, Schering presented evidence that CPE could be observed two days after inoculation in 16 of Schering's 31 trials. The levels of CPE in those 16 trials ranged from 12.5% to 50%. Only in five of the 31 trials could at least 25% CPE be observed after two days and only in one of the trials could CPE 50% be observed after two days. Schering asserts, on the basis of this data, that if the process was timed to stop at the moment significant CPE was observed, it would stop at two days. After two days, however, CPE exists in only half of the samples, and only in five samples

has the CPE developed to the point where it would be considered significant.

Likewise, in the production runs on which data was specifically obtained for trial, two of the six runs showed a 30% level of CPE 6 hours before the earliest possible time of harvesting, while three runs showed levels of 15% and one run showed levels of 20%. Therefore, only in one-third of the runs would stopping six hours earlier than Boehringer's patented process requires result in significant CPE.

▇▇▇ The jury could reasonably conclude from this evidence that while in some of the runs 25% CPE appeared after two days, it most consistently appears after XX days. The jury did not hear evidence that would indicate that significant CPE always or even generally appeared well before the three-day period. In the majority of the trials it appeared in the three-day period. This conclusion alone would justify their verdict finding equivalency between the processes without reading out the word "until" from the patent.

The jury could also reasonably conclude from the evidence before it that 25% CPE and 50% CPE are equivalent, and so the timing of Schering's process which coincides with 50% CPE is the equivalent of Boehringer's patented process. Evidence was presented that 25%—75% CPE was significant and produced the vaccine. A process that ended at the onset of 50% CPE could therefore be the equivalent of a process that ended at the onset of significant CPE without reading the word "until" out of the patent. So long as the process was timed to end at the onset of significant CPE, and not any time after that onset, Schering's timing device could be the equivalent of "until the observation of CPE."

Finally, the jury heard evidence that CPE strongly correlated to growth of virus, and that CPE was observed in devel-

oping Schering's process for timing the harvesting of the virus. The jury was presented with minutes from Schering's PRRS planning meeting, which included the observation: "[t]here appears to be a 12–hour optimal harvest window. It is recommended that the virus fluid be harvested at XX hours post-inoculation. CPE at that time is 1–3 [25%–75%]. If CPE goes beyond 3, titers will be considerably lower." These minutes indicate that Schering found the levels of CPE to bear a significant relationship to development of the virus. Likewise, the jury was presented with evidence that Schering records the levels of CPE after incubation is completed in each of Schering's regular production runs. From this evidence, the jury could reasonably conclude that Schering's timing coinciding with onset of significant CPE was not just fortuitous and that Schering knew that the levels of CPE bore a direct relationship to the development of the virus.

 Schering's second ground for its Rule 50(b) motion is that Boehringer's evidence does not address whether there are only insubstantial differences between ATCC–VR2332 and ATCC–VR2525. As noted above, according to the Supreme Court in *Warner–Jenkinson,* "an analysis of the role played by each element in the context of the specific patent claim will thus inform the inquiry as to whether a substitute element matches the function, way and result of the claimed element, or whether the substitute element plays a role substantially different from the claimed element." *Warner–Jenkinson,* 520 U.S. at 40, 117 S.Ct. 1040. Parties claiming infringement must do more than assert the insubstantial differences between two allegedly equivalent elements; they must provide evidence of the ways in which the two elements serve the same function, way and result. *Tronzo v. Biom-*

*et, Inc.,* 156 F.3d 1154 (Fed.Cir.1998) (reversing a finding of equivalency because the plaintiff's expert had simply asserted the two elements' equivalency and had not offered reasons why they could be considered equivalent for purposes of the patent); *Sage Prods.v. Devon Indus., Inc.,* 126 F.3d 1420 (Fed.Cir.1997).

 According to Schering, Boehringer's evidence only establishes that Schering's strain is a swine infertility and respiratory syndrome virus, not that Schering's particular strain of that virus is actually equivalent to Boehringer's patented strain. In contrast, Schering contends that it has demonstrated substantial differences between the strains. First, Schering notes ATCC–VR2525's lack of reactivity with the monoclonal antibody SDOW–17, which the patent examiner concluded was grounds for allowing the patent of ATCC–VR2525 over prior art. Second, Schering observes that there are 73 differences between the nucleotide sequences of the two strains, and that ten or more differences would mean the two strains are "not closely related." Third, Schering points to differences in the amino acid sequences, which allow a sugar to attach to glycosylation sites on the ATCC–VR2332 strain but not on the VR2525 strain, and the ability of the MLU–1 enzyme to cut the ATCC–VR2332 strain but not the VR2525 strain. According to Schering, these differences are significant for those attempting to identify the strain.

Boehringer argues that the above differences are not significant for purposes of patent. Boehringer points out that the patent does not claim a particular strain of the virus but instead claims that it *uses* a particular strain of the virus; therefore, it is how that virus is used rather than all the characteristics of the virus itself that are significant in the context of the patent.

In support of its claim that the two virus strains are insubstantially different, Boehringer presented evidence, through the testimony of Dr. Dubovi that ATCC–VR2525 is a typical Mystery Swine Disease virus, and that the two strains are indistinguishable in their growth on MA–104 cells in the presence of serum in a suitable growth medium at an incubation temperature of approximately 34 degrees Celsius to 37 degrees Celsius. Dr. Dubovi further testified to other common properties in the context of the claimed process, including that both viruses grow to high titers in MA–104 cells, and that both strains would be perceived by the immune system of a pig in an identical manner. Significantly, Boehringer's expert Dr. Dubovi and Schering's expert Dr. Rowland agreed that the function, way and result of the strains are the same, and that the viruses are "indistinguishable," "interchangeable," and "equivalent" under claim 2 of the patent with respect to the characteristics named by Dr. Dubovi above. Tr. at 10.113:13—10.116:14; 10:118:9–12; 10.118:25—10.119:4; 10.119:16–22; 10.135:20—10.136:1; 11.52:22—11.53:14. Based on this evidence, the jury could properly conclude that in the context of the patented claim the two strains are indistinguishable.

This court also finds that the evidence presented by Schering to demonstrate that the differences between the two strains are significant does not establish those differences in the context of the patented claim. Schering points to differences such as genetic sequence, antibody reactivity and growth characteristics on a different cell type without demonstrating why those differences are significant *in the context of the patented claim.* Each of the above differences demonstrate that ATCC–VR2332 and ATCC–VR2525 are literally different elements; however, the evidence does not demonstrate that they do not serve the equivalent function in the context of the patent.

Nor does the fact that Schering has patented its strain of the virus after disclosing the existence of ATCC–2332 as prior art conclusively demonstrate substantial differences between the two strains. First, the existence of a separate patent for a claim is relevant and should be weighed by this court; however, such a patent is not dispositive of infringement. *See National Presto Indus., Inc. v. West Bend Co.,* 76 F.3d 1185, 1192 (Fed.Cir. 1996). An improvement in a step of a patented method, even if separately patentable, may not avoid infringement. *See Atlas Powder Co. v. E.I. du Pont De Nemours & Co.,* 750 F.2d 1569, 1580. Second, the patent Schering obtained is for the strain itself, not for the process of producing the virus at issue in this litigation. Therefore, the patent proves no more than the other differences cited by Schering above: that Schering's strain is literally different than Boehringer's strain. The patent does not provide evidence of the inquiry relevant to the instant case: whether, in the context of the claimed process, the two strains are equivalent elements.

Requiring a showing that the two strains are different for the purposes of the patent does not, as Schering asserts, write the ATCC–VR2332 element out of the claim, but only establishes the appropriate standard for findings of equivalency for each element of a claim. The jury could reasonably determine, as Dr. Dubovi testified, that the differences that exist between the viruses, such as genetic sequence, antibody reactivity and growth characteristics on a different cell type, are irrelevant, as they do not affect the ability of a PRRS virus to fulfill its function in the context of the claim. Boehringer presented evidence sufficient for the jury to conclude that Scher-

ing's virus performs the exact function, in the same way, achieving the same result as ATCC–VR2332.

 Schering's third assertion in its Rule 50(b) motion is that claim 2 of the '778 patent is invalid for obviousness. This court discussed the law of obviousness in the context of the parties' earlier summary judgment motions. *See Boehringer II*, 6 F.Supp.2d at 333. As the court noted in that opinion, Section 103(a) of the patent law provides:

> A patent may not be obtained ... if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.

35 U.S.C. § 103(a). The court observed that obviousness under section 103 is ultimately a question of law that involves four factual inquiries:

(1) the level of ordinary skill in the pertinent art; and

(2) the scope and content of the prior art; and

(3) the differences between the claims and the prior art; and

(4) secondary considerations, if any, of non obviousness .... [including evidence of] commercial success of the invention, satisfying a long-felt need, failure of others to find a solution to the problem at hand, and copying of the invention by others.

*Id.* Patent claims are presumed valid under 35 U.S.C. § 282. As a result, Schering has the burden of overcoming this presumption by clear and convincing evidence that the claimed invention was suggested in the prior art and that one of ordinary skill in the art would have had a reasonable expectation of success in replicating

the invention based on the prior art disclosure. *See, e.g., In re Vaeck,* 947 F.2d 488, 493 (Fed.Cir.1991); *In re O'Farrell,* 853 F.2d 894, 903–4 (Fed.Cir.1988). An invention is not obvious where the prior art gives "no direction as to which of many possible choices is likely to be successful." *In re O'Farrell,* 853 F.2d at 903. As this court has previously found, it is not enough that a method is "obvious to try." *Boehringer I,* 984 F.Supp. at 256. Rather, one must have a reasonable expectation of success. *Id.* at 255. An invention is merely obvious to try if "a general disclosure may pique the scientist's curiosity, such that further investigation might be done as a result of the disclosure, but the disclosure itself does not contain sufficient teaching ... or that the claimed result would be obtained if certain directions pursued." *Id.* at 256, quoting *Gillette Co. v. S.C. Johnson & Son,* 919 F.2d 720, 725 (Fed. Cir.1990).

 Based on this court's previous determination of the scope and content of the prior art, Schering contends that the only difference between the prior art and claim 2 of the '778 patent concerns the selection of a cell line on which to inoculate the virus. *Boehringer II,* 6 F.Supp.2d at 335–36. Schering further argues that the Collins and Benfield homogenate provided the source virus material to be inoculated on a cell line and the Dea *et al.* and Van Alstine articles provided the motivation and reasonable expectation of success for using a simian cell line, and in particular an MA–104 cell line, for growing and isolating the virus.

Evidence presented by Schering at trial, however, does not support Schering's conclusions. Dr. Rowland testified that the Dea reference used Vero cells, a simian cell line, and three other cell lines in an attempt to grow PRRS virus. Tr. at 10.83:2—10.84:9. While the EMC virus was

isolated on Vero cells, the PRRS virus was not. Nor did Dea use MA–104 cells, which are essential to claim 2 of the '778 patent. Tr. 11.101:17—11.102:4. Likewise, the Dea reference does not discuss using simian cells with the other elements of the claim, including the use of serum. While these other elements were established prior art, Schering must show that the prior art teaches or suggests the combination of the Dea reference with any other prior art. *See, e.g. In re Fine,* 837 F.2d 1071, 1075 (Fed.Cir.1988).

Furthermore, as this court found in *Boehringer IV,* 106 F.Supp.2d 667, Boehringer provided evidence to the patent examiner on PRRS research concluding that the EMC virus was not etiologically responsible for PRRS; Boehringer also disclosed the Pol reference, confirming that the EMC virus was not responsible for the PRRS virus. *See id.* at 686. "After studying this case for years, this Court finds that Schering has not proven the materiality of Dea's use of Vero cells to isolate (in only 4 of 19 potentially infected herds) a known swine virus with which others believed they had fulfilled Koch's postulates regarding only some of the reported symptoms associated with PRRS." *Id.* at 688.

Dr. Rowland also testified that the Van Alstine reference reported an attempt to grow PRRS virus on eight different cell types, one of which was MA–104 cells, and that the swine influenza virus was isolated. Tr. at 10.92:19—10.94:12. The Van Alstine reference did not grow or recover PRRS virus, and the swine influenza virus that was recovered was not grown on MA–104 cells. Tr. at 11.102:2–4; 11.108:15–17. Thus, at most MA–104 cells would be obvious to try among an array for attempting to isolate the PRRS virus. Schering did not introduce evidence showing that the prior art either teaches or suggests the combination of the Van Alstine reference

with any other prior art. *See In re Fine,* 837 F.2d at 1075. As this court noted in *Boehringer IV,* "This court will not again respond to Schering's argument that Van Alstine made it 'obvious to try' MA–104 cells. Even if Van Alstine taught one of ordinary skill to include MA–104 cells in a test array, without also teaching an expectation of success on MA–104 cells, Van Alstine could not have been important to a reasonable examiner considering Van Alstine in light of 35 U.S.C. § 103." *Boehringer IV,* 106 F.Supp.2d at 690.

Finally, Schering asserts that the contemporary work of others demonstrates obviousness; however, each of the other researchers did not succeed until at the earliest, the beginning of 1992, while Boehringer filed its patent in August of 1991. At best their work demonstrates that the approach Boehringer took was obvious to try, but not that Boehringer would have a reasonable expectation of success. Indeed, as Boehringer notes, Mr. Harris had to do 144 experiments before he found the solution. If the work of others had demonstrated the successful approach, this large number of experiments would not have been necessary to obtain the result Harris ultimately achieved. The work of Mr. Harris's colleagues does not demonstrate that the use of MA–104 cells and the Collins and Benfield homogenate was state of the art because no one, prior to Dr. Harris, had succeeded prior in successfully growing the Mystery Swine Disease using these approaches. Rather, it was a method which others had identified as obvious to try.

As a result, Schering did not demonstrate that one of ordinary skill in the art, in light of the prior art of the Collins and Benfield homogenate and the Dea and Van Alstine articles, could reasonably have expected that the PRRS virus could be grown under the claimed conditions on

MA–104 cells. Therefore, Schering has failed to prove that claim 2 of the '778 is invalid for obviousness.

### 3. *Rule 59 Motion*

As the court noted above, while a motion for a new trial is generally entrusted to the discretion of the trial court, the grant of a new trial because the verdict is against the great weight of the evidence is only appropriate when "the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks our conscience." *Greenleaf,* 174 F.3d at 366 (citation omitted).

Schering contends that a new trial should be granted pursuant to Rule 59 on the grounds that jury's verdict was contrary to the overwhelming weight of the evidence, because the trial was permeated by improper, irrelevant evidence concerning Boehringer's vaccine and due to the brevity of the jury's deliberations. The court will address each of Schering's contentions in turn.

Schering argues that the jury's finding that Schering's commercial process of timed incubation is equivalent to the claim requirement of "incubating ... until CPE is observed" is contrary to the overwhelming weight of the evidence. Schering raises the same arguments that it raised above in support of its Rule 50 motion. Schering asserts that Boehringer's evidence, specifically, Dr. Dubovi's testimony, was not sufficient to demonstrate equivalency, while Schering's evidence, in the form of Dr. Hess's testimony, Richard Cyrus's testimony and Dr. Rowland's testimony demonstrated that Schering's production method was based on maximum titer production rather than on the visual observation of CPE.

Although the standard for granting a new trial is less demanding than the stan-dard for granting judgment as a matter of law, this court finds that even under the less demanding standard, Schering has failed to establish that the jury's finding of equivalency between Schering and Boehringer's timing processes is contrary to the great weight of evidence. As the court noted above, most of the tests submitted as evidence by Schering demonstrated that significant CPE occurs after a three-day period. Therefore the weight of the evidence supports the jury's finding that Schering's three-day time period is the equivalent of inoculation until significant CPE is observed. The court also found that the evidence presented by Boehringer demonstrated that the appearance of CPE strongly correlated to the growth of the virus, that CPE levels at the time of harvesting were noted when planning Schering's process, and that those levels are recorded after Schering's process is implemented in each commercial run. As a result, the weight of the evidence supported the jury's finding that Schering's timing coinciding with the onset of significant CPE was more than fortuitous.

 Schering also contends that the jury's finding that Schering's vaccine virus strain ATCC–VR2525 is equivalent to the claimed virus strain ATCC–VR2332 affords Boehringer broader patent coverage than the PTO would have allowed and is contrary to the great weight of evidence. As the court notes above, however, the court interpreted Boehringer's claim to be limited to the particular virus strain ATCC–VR2332 based on the claim's literal language. *See Boehringer I* at 248–250. The prosecution history consisting of Boehringer's deposit of a strain of the virus was consistent with the requirement that Boehringer demonstrate how to practice the art it claimed. Deposit of the strain did not constitute a surrender, given that the claim was already facially limited

to the strain. Therefore, in bringing its equivalency claim, Boehringer is not seeking to recover a claim which it surrendered during the prosecution of the patent, and, as a result, is not subject to prosecution history estoppel.

The jury's finding that Schering's vaccine virus strain ATCC–VR2525 is equivalent to the claimed strain is consistent with the great weight of the evidence. As the court noted above, Boehringer presented testimony demonstrating that in the context of the patented claim, the two strains are indistinguishable. Although differences exist between the viruses, such as genetic sequence, antibody reactivity and growth characteristics on a different cell type, Boehringer presented sufficient evidence to support the jury's finding that such differences in characteristics are irrelevant, as they do not affect the ability of a PRRS virus to fulfill its function in the context of the claim. Schering did not present evidence sufficient to find that the differences between the two strains were significant in the context of the patented claim. As both parties' experts agreed, the function, way and result of the strains are the same, and the viruses are "indistinguishable," "interchangeable" and "equivalent" under claim 2 of the patent.

Schering further asserts that the trial was permeated by numerous references to Boehringer's vaccine and its impact on swine herds. Because the '778 patent does not claim a vaccine, Schering asserts that Boehringer's references to the vaccine were not only irrelevant but also highly prejudicial because they invited the jury to decide the equivalents issues based on the vaccine instead of the claimed process. *See* Schering's Rule 59 Brief at 3.

Prior to trial, United State Magistrate Judge Chesler issued an order barring Schering from introducing any evidence criticizing Boehringer's vaccine and, in turn, barring Boehringer "from introduc-ing evidence of commercial success of the claimed process as a secondary indicia of nonobviousness." The court continued:

> Boehringer will not present any evidence demonstrating a nexus between Boehringer's commercial vaccine and the claims of the patent-in-suit. In addition, Boehringer must make a pre-testimony proffer to Judge Ackerman that any evidence it will seek to introduce concerning the importance of its vaccine or general market information concerning its vaccine will not constitute a back door effort to demonstrate commercial success of the invention.

The court revisited the issue when reviewing Schering's objections to a timeline which Boehringer sought to introduce as an exhibit. The court permitted Boehringer to preserve an indication of the date Boehringer began to sell its vaccine to the public, but disallowed an indication of the date of "Industry praise for Boehringer's vaccine: a 'big break-through,' a new hope." Tr. at 2.9:10–2.11:1. In disallowing Boehringer's reference to industry praise, the court found that while the reference did "not rise to the level of arguing 'commercial success' to the jury, instead it pushes the envelope under rule 403." Tr. at 2.11:20–23. The court indicated that

> I do not want to hear much testimony on [Boehringer's] vaccine during the course of the trial. It has limited relevance and I don't want the jury to be sidetracked here. The jurors have many new and complex issues in front of them, and it is my job to make sure that the evidence which is presented to them is sufficiently probative of relevant material. This will only be a reoccurring theme and will prompt repeated objections during this trial if Boehringer attempts to introduce too much evidence of its vaccine.

Tr. 2.11:2–11.

Schering alleges that Boehringer made repeated references to the vaccine and

that it implied that the vaccine was the embodiment of the claimed material. In support of its arguments, Schering cites references to the development of the vaccine in testimony by four of Boehringer's witnesses. The court finds that two of these references clearly provided the kind of minimal background material on the relationship of the virus to the vaccine that was permitted by the court. Specifically, Paul Hays testified that after Boehringer developed the claimed method for isolating and growing ATCC–VR2332, it obtained U.S. Department of Agriculture approval for two vaccines for Mystery Swine Disease and exclusively controlled the Mystery Swine Disease Market for two years. Tr. At 2.110:20 to 2.112:6; 2.116:2–18. Likewise, Lou Harris testified about his claimed method for isolating and growing the ATCC–VR2332 strain of the virus and the steps for turning that virus into a vaccine. Tr. At 4.70:18–4.74:3.

Hays' and Harris' testimony could also be viewed as establishing a nexus between the commercial vaccine and the patented process, evidence forbidden by Judge Chesler's order. Even if such a nexus were implied, however, there is no underlying evidence on the record regarding the commercial success of the vaccine. As a result, the jury had no grounds on which to make impermissible findings regarding this secondary indicia of non-obviousness. Hays' and Harris' testimony did not constitute "a back door effort to demonstrate commercial success of the invention," as forbidden by Judge Chesler, but served instead as the permitted evidence of "the importance of its vaccine or general market information concerning its vaccine."

Schering also objects to a reference made by Dr. Dee, who described at length the devastating effect of Mystery Swine Disease on swine herds, and who concluded his testimony by responding a question about whether he had a treatment for this disease with the response: "Yes, in 1994 . . . it was when the Boehringer Ingelheim PRRS's vaccine became commercially available in '94." Tr. 2.143:10–22. The court finds that the reference did not touch upon the commercial success of the vaccine, but instead addressed the importance of the vaccine as Judge Chesler's order anticipated Boehringer might. Given the court's later instructions to the jury clarifying that the patent did not extend to the vaccine, the court does not find this limited reference so significant that it would have caused the jury confusion about the subject matter of the patent.

Finally, Schering objects to two statements to which it did not object at trial. Specifically, it objects to a comparison Dr. Dubovi made in a single sentence of his testimony, in response to the question "how would a pig's immune system perceive the ATCC–VR2332 from Boehringer and the 2525 from Schering?" Dr. Dubovi responded: "It is my opinion that they would be essentially identical by the pig." Tr. 5.48:5–9. Schering did not object to this reference at the time of trial. Likewise, Schering asserts that although Boehringer made two references in its closing argument to the fact that the patent does not cover the vaccine (Tr. at 18.122:5–6; Tr. at 18.137:24–25) its reference to the fact that its "discovery, which is described in our patent, showed the world how to make the vaccine that protected the pigs and saved the farmers" (Tr. At 18.118:7–10) and to Boehringer's assertion that "[o]ur claim covers no more and no less than the only practical way to make a vaccine for Mystery Swine Disease the way Schering does it" (Tr. At 18.138:1–3) prejudiced the jury. Again, however, Schering did not raise an objection to these statements at trial. Under the law of the Third Circuit, by failing to object at trial, Schering has waived these arguments. *See Waldorf v. Shuta,*

142 F.3d 601, 629 (3d Cir.1998) ("a party who fails to object to errors at trial waives the right to complain about the following trial"); see also *Murray v. Fairbanks Morse,* 610 F.2d 149, 152 (3d Cir.1979) ("[c]ounsel's failure to object precludes him from seeking a new trial based on the impropriety of opposing counsel's closing remarks.") Moreover, the testimony was extremely limited in scope and reflected what is explicitly set forth in the '778 patent specification: that the purpose of the patented method was to produce a vaccine. *See* Plaintiff's Trial Exhibit at col. 5, line 23 to col. 7, line 22.

Taken together, the references to the vaccine are of such a limited nature, totaling less than eight transcript pages out of the more than two thousand four hundred pages of testimony and proceedings before the jury. The court finds that these references did not "permeate" the trial. Given that the jury instructions and Boehringer's counsel's closing arguments made clear that the patent did not extend to the vaccine, the court finds it unlikely that the jury was prejudiced by these brief references.

■ Schering's final argument in support of its Rule 59 motion is that the jury's deliberations were so brief as to merit a new trial. Indeed, the jury, after hearing 17 days of testimony and complex scientific evidence, deliberated for two hours before reaching a verdict. As Schering notes, however, brevity of jury deliberations does not by itself justify a new trial. *See Paoletto v, Beech Aircraft Corp.,* 464 F.2d 976, 983 (3d Cir.1972). Only brevity combined with a verdict that is contrary to the great weight of evidence supports the grant of a new trial. *See Kearns v. Keystone Shipping Co.,* 863 F.2d 177, 182 (1st Cir.1988). Since this court has concluded that the verdict in this case is not contrary to the great weight of evidence, the brevity of the jury's deliberations does not provide grounds for a new trial. Moreover, although the issues presented at trial in this case were not necessarily within the common knowledge of the jurors and the trial was relatively lengthy, I observed that the jurors were attentive during the trial and careful in their deliberations.

Having presided over the trial in this matter and having carefully reviewed the arguments and evidence presented by counsel in connection with this motion, I do not find that a new trial is warranted. Put simply, the jury's verdict was not against the weight of the evidence; rather, it was in accordance with the weight of the evidence. Essentially, the jury was required to determine which of these conflicting accounts was more credible, bearing in mind the plaintiff's burden of proof. The jury carried out its duty to evaluate the evidence and assess the credibility of all of the witnesses. This court does not conclude that the jury's verdict in favor of the plaintiff was against the weight of the evidence. There was an abundance of evidence to support the jury's verdict. As such, the jury's verdict does not shock the conscience, nor does it result in a miscarriage of justice.

### *Conclusion*

Therefore, for the reasons stated above and in conjunction with the order issued this same day, this court concludes that Schering's motion for judgment as a matter of law, renewed motion for judgment as a matter of law, and motion for a new trial are denied.